**UNITED STATES of America,**
**Plaintiff,**

v.

**Mark D. LAY, Defendant.**

**No. 1:07 CR 339.**

United States District Court,
N.D. Ohio,
Eastern Division.

July 8, 2008.

Benita Y. Pearson, Antoinette T. Bacon, for Plaintiff or Petitioner.

Percy Squire, Richard M. Kerger, for Defendant or Respondent.

## MEMORANDUM OPINION ANALYZING THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. SECTION 3553(a)

DAVID D. DOWD, JR., District Judge.

### I. Introduction

The Court conducted the sentencing hearing of the defendant on July 3, 2008. The Court determined that the defendant's total offense level was 39 with a criminal history category of I calling for a sentencing range under the advisory sentencing guidelines of 262 to 327 months.[1]

The total offense level of 39 had the following three components:

| | | |
|---|---|---|
| 1. | Based offense level | 7 |
| 2. | Specific offense characteristic based on a loss of more than $200 million | 28 |
| 3. | As the defendant was an investment advisor increase by 4 levels | +4 |
| | TOTAL OFFENSE LEVEL | 39 |

In the defendant's supplemental sentencing memorandum, the defendant now contends that the issue of the amount of loss to the OBWC should have been submitted to the jury and that it was improper for the Court to make that determination without a jury finding. First, the Court observes that the extent of the loss was never disputed. Second, the Court's determination of the loss was not contrary to law and the belated objection of the defendant is denied.

The Court published an order on the 5th day of May, 2008, overruling objections to the presentence report brought by both the government and the defendant. See Docket No. 157. The Court's order also placed the government on notice that it was considering a downward variation from the minimum sentence of 262 months.[2]

The evidentiary hearing regarding the defendant's sentence began on Tuesday, May 27, 2008. The government and the defendant filed separate sentencing briefs on Friday, May 23, 2008. After considering the government's sentencing brief, the Court declared on Tuesday, May 27, 2008,

---

1. The maximum sentence for count 1 under the statute is five years. The maximum sentence for counts 2, 3 and 4, under the statute, is 20 years.

2. The Court gave notice of a possible downward variance in response to United States v. Cousins, 469 F.3d, 572 (6th Cir.2006). However, the June 12, 2008 decision of the Supreme Court in Richard Irizarry v. United States, 553 U.S. ——, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008) makes such a presentence notice unnecessary.

that it would hear testimony of the defendant's witnesses who were present, but continue the final sentencing hearing until July 3, 2008, in order to give counsel for both the government and the defendant the opportunity to respond to factual materials set forth in the separate sentencing briefs.[3]

## II. The Analysis Required by 18 U.S.C. § 3553(a)

The Court's analysis of the sentencing factors required by *Booker* and the statutory guidance provided by 18 U.S.C. § 3553(a) follows the structure of the statute.

18 U.S.C. § 3553(a) provides as follows: (a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

A. 18 U.S.C. § 3553(a)(1)—Nature and Circumstances of the Offense [4]

1. The Court's Memorandum Opinion Denying Defendant's Motion for Acquittal or New Trial

The defendant filed a motion following the jury verdict, moving for an acquittal, or in the alternative, for a new trial. The Court denied both motions in a 50-page opinion to which the Court directs the reader for an explanation of the nature and circumstances of the offenses resulting in the defendant's conviction of counts 1, 2, 3 and 4. *See* Docket No. 158.

2. A Summary of the Offense Conduct for which the Defendant Stands Convicted

Appendix I, attached hereto, is a part of the presentence report and describes in considerable detail the offense conduct and in reliance upon information received from the government.

The government's factual presentation in support of investment fraud as well as the conspiracy claim supporting counts 2, 3 and 4, emphasized the massive over-leveraging by the defendant which led to the loss of the OBWC funds in excess of $200 million. The government's sentencing memorandum summarizes at page five (Docket No. 161) the scope of the defendant's over-leveraging in the following passage:

During these 14 months, Lay executed approximately 235 trades on behalf of the ADF. *See* Durgin Tr., docket No.

---

**3.** The sentencing hearing conducted on July 3, 2008 began at 8:00 a.m. and ended after 4:30 p.m. The Court continued the sentencing hearing until Tuesday, July 8, 2008, in order to give counsel the opportunity to present arguments on the issue of a variance.

**4.** The history and characteristics of the defendant will be analyzed in the following section.

119, p. 36. In 62% of those trades, Lay used leverage in excess of the 150% agreed to causing a loss of approximately $212 million.

3. A Summary of the Activities of the Defendant Advanced by the Government and in Support of a Sentence Within the Advisory Guideline Calculation

a. Lay's Failure to Accurately Describe His Employment History in the PPM

The PPM (government's trial exhibit 6) credited the defendant with the following employment history

Mark D. Lay, age 39, Chairman of the Board and Chief Executive Officer of the Investment Adviser, received his Bachelor of Arts in Economics from Columbia University in 1985. From **1984 to 1989**, Mr. Lay was with Citicorp Investment Bank among other positions served as a vice president in foreign exchange trading responsible for hedging portfolios using government bonds, futures and commodities. From September 1989 to July 1992, he was with Dean Whitter Reynolds, Inc. as an investment account executive. In 1993, Mr. Lay founded the predecessor to MDL Capital Management, Inc. and has been its principal shareholder and Chairman of the Board since that time. (Emphasis added.)

As is apparent, the employment history of the defendant failed to disclose his prior employment with both the Mellon Bank and PNC.[5] Had that Mellon Bank and PNC employment history been disclosed to OBWC, it is entirely possible that OBWC would not have invested $225,000,000 in the hedge fund.

5. The defendant's employment history with Mellon Bank and PNC is summarized in sup-

b. The Government's Claim of Recidivism

Counsel for the government has labeled the defendant as a recidivist even though the defendant has no prior criminal record. The label of a recidivist, as used by the government, relates to the fact that on two previous occasions the defendant, while employed in the investment business, had engaged in conduct that led to his dismissal. Specifically, the government alleged in its sentencing brief as follows:

Lay's fraud against the OBWC is not an isolated incident, but rather is part of pattern that repeated throughout his career. When Lay starts to lose money, he will do anything in his power, including breaking the rules, lying and covering up, to make the money back. OBWC's losses were no mistake or accident. There was no miscommunication or misunderstanding. Lay knew what he was doing, knew it broke the rules, knew that he was costing the OBWC dearly.

The government's declaration related to the fact that the defendant, while previously employed as a foreign exchange trader at the Mellon Bank, had broken the rules of Mellon for its traders resulting in losses to Mellon Bank and resulting in the termination of the defendant.

The government described the defendant's conduct at Mellon Bank as follows:

In 1988, Lay worked as a foreign exchange trader at Mellon Bank. During Lay's employment, Steven Peras headed the North American Foreign Exchange Group. Peras testified via video conference in an in camera proceeding and was subject to cross-examination. Peras testified that Mellon established rules for

port of the government's claim of recidivism.

its traders. First, "[e]ach trader was given a position limit and loss limit of how they were to conduct themselves and be able to take positions." [Peras Tr. Docket No. 154, p. 9] In addition, traders "had requirements being able to maintain proper blotters. They had to maintain that if there was going to be any overnight trading, these positions would be done by approval previous to taking the positions and they were not authorized to trade with any other bank other than the Mellon Bank system." [Peras Tr. docket No. 154, p. 10]. Peras testified that Lay broke those rules.

Peras explained that one evening he learned of a problem with the previous night's positions. As his team researched the problem, they went to Lay's desk looking for his blotter, but it was not there. According to Peras, "There's no reason at all why a blotter would be taken home; that's bank property." [Peras Tr. docket No. 154, p. 13]. Peras called Lay at home and instructed Lay to return to the office with his blotter. Once Lay returned with the blotter, Peras realized that Lay failed to enter trades into his blotter, duplicated trades, traded off premises without authorizations, and traded with non-Mellon group entities. [T. 14]. Peras said that after "several hours of conversation," Lay began admitting to "hiding trades . . . trading off premises without approval . . . dealing with Citi Bank that was not authorized to trade for overnight trading, and he admitted about lying about his losses." [T. 16]. Peras said that Lay claimed his actions were a mis-

take, but Peras did not believe Lay. When asked why Peras did not believe that Lay's actions were a mistake, Peras responded, "Because if it would have been one trade, it's understandable. It wasn't one trade. There were about eight or ten trades that were either hidden, that were done off premises without authorization, that were done off premises without having any right to deal with that bank. There were trades that were fictitious, put on his blotter that were not real. . . . He made them up." [T. 22].

Due to Lay's fraud, Mellon suffered a loss. Peras noted in a July 19, 1988 memorandum, "Unfortunately, no matter how many controls and procedures we implement, if a trader is dishonest there is a certain amount of time that we are vulnerable." As a result of Lay's fraud, Mellon fired him.[6]

The second example of the defendant's misconduct in support of the label of recidivism, relates to the defendant's employment at Pittsburgh National Bank (PNC).

The government described the defendant's conduct at the Pittsburgh National Bank as follows:

After Mellon fired Lay, he started work as a foreign exchange trader at Pittsburgh National Bank (PNC). Lay's fraud and deceit continued at PNC, beginning with his employment application. Lay reported on page two of his employment application that he earned a 3.0 grade point average at Columbia University, when his transcript reflects a 2.482 grade point average.

---

6. Prior to the commencement of the trial, Steven Peras was deposed in a video deposition. At the time of the deposition, Peras was overseas. His testimony was recorded. *See* transcript of the Peras deposition at Docket No. 154. The Court did not permit the government to introduce the Peras deposition during its case. The defendant elected not to testify and therefore, was not subject to cross examination with respect to his prior employment at the Mellon Bank. Nevertheless, the Peras deposition is cited by the government in support of its claim of recidivism. The government played the video deposition of Steven Peras during the July 3, 2008 hearing.

After Lay had worked a short time at PNC, PNC heard rumors about Lay's performance at Mellon and the circumstances surrounding his departure. PNC met with Lay to ask about his prior employment. According to an October 24, 1988 memorandum from Lee Cutrone, Lay explained that he "made a mistake when recording his daily transactions, and this ultimately resulted in a financial loss to the institution in question." Cutrone further stated that he "emphasized to Mr. Lay the importance of strictly adhering to procedures established by the foreign exchange department." Peras, during his testimony by video camera did not attribute Lay's actions to a "mistake". (Peras Tr. docket No. 154, p. 30.) Sadly, Lay did not do so and caused a significant loss to PNC. On July 27, 2007, S.A. David Becerra interviewed Bruce Cobb, Lay's supervisor at PNC. Cobb stated, "Lay's actions caused problems so severe that Cobb remembered the incident still today." Cobb recounted that during July of 1989, PNC's foreign currency trading desk had suffered losses approximately $80,000 to $90,000 greater than expected. Cobb originally thought there was an arithmetic error, and conducted further research. Cobb learned that the loss was related to Lay's trading, and he arranged to meet with Lay on Monday, July 24, 1989. At the meeting, Cobb told Lay that he was reducing Lay's trading guideline from a range of $1–$3 million to a flat $1 million, and encouraged Lay to take some vacation to get away from the stress of trading. Cobb noted that Lay's account showed a $112,000 loss. Lay did not appear for work the next day and Cobb could not reach Lay at home. Cobb began reviewing Lay's trading records and discovered that Lay conducted a number of trades on Sunday, July 23rd and Monday July 24th, before his meeting with Cobb. Yet, Lay failed to mention these trades to Cobb during their meeting. Moreover, Cobb discovered two trades of $3 million each, which exceeded Lay's trading guideline. Lay never recorded the trades in PNC's books. Cobb said that it was apparent that Lay tried to trade over the weekend to try to recover his losses. Instead of recovering the losses, Lay lost almost $1 million.

Cobb told the FBI that he tried to contact Lay at home several times, to no avail. Lay finally met with Cobb and admitted that he tried to "trade his way out of his losses." Cobb noted that his department was so small that the $1 million loss was "significant." As a result of this confirmed fraud, PNC fired Lay.[7]

In further support of the label of recidivism, the government's sentencing brief described the similarity of the defendant's conduct at Mellon, PNC, and OBWC as follows:

i. The rules:

Mellon: Do not trade after hours without permission Record all trades

PNC: Do not trade after hours without permission
Do not trade for one week
Record all trades

OBWC: Do not leverage over 150%

ii. Lay Broke the Rules:

Mellon: Traded overnight
Did not record all trades Maintained fictitious trade blotters

PNC: Traded over the weekend
Traded during the one week ban Exceeded his trading guideline

---

7. Bruce Cobb testified during the sentencing hearing conducted on July 3, 2008.

OBWC: Lay well-exceeded [sic] the 150% leverage limit

iii. When Suspected:

Mellon: Lay ran out of work to catch a bus

PNC: Lay didn't come to work

Lay did not answer the phone

OBWC: Lay did not answer the phone

Lay postponed meetings

Lay lied about the leverage amount (to Gasper and McLean)

iii. When Caught:

Mellon: Called it a reporting error

PNC: Did not admit the full loss

OBWC: Did not admit to the OBWC the full leverage

Did not admit to the OBWC the full loss

Lied to Olympia about OBWC's consent to leverage

Lied to Credit Suisse about OBWC's consent to leverage and fabricated a document

Lied to Adatepe about OBWC's consent to leverage

Lied to Citigroup about OBWC's intent to invest

Lied to Bonds Direct about OBWC's intent to invest

v. When losing on investments:

Mellon: Recklessly tried to trade his way out of losses

PNC: Recklessly tried to trade his way out of losses

OBWC: Recklessly tried to trade his way out of losses

vi. Aftermath: [8]

Mellon: Lost money

PNC: Lost money

OBWC: Lost money

4. The Government's Allegation of Lies to Bonds Direct

In support of this claim, the government charges as follows:

One of Lay's first lies to Bonds Direct occurred when Lay requested delayed settlement on his trades. Lay mischaracterized the nature of the ADF, failing to tell Bonds Direct that the ADF was a hedge fund. By withholding that crucial piece of information, Lay exposed Bonds Direct to risk of loss.

Lay lied again to Bonds Direct when he falsely claimed that the OBWC intended to infuse capital into the ADF. Lee Fensterstock testified that in October of 2004, one of MDL's trades failed. Lay told Fensterstock that the client would provide funds to settle the trade. [Fensterstock Tr. Docket No. 143, p. 382]. Fensterstock eventually learned that OBWC was the client and contacted Jim McLean, who told Fensterstock that the OBWC would not invest more money in the ADF. [Fensterstock Tr. Docket No. 143, p. 383].

Fensterstock also testified that he worked with Mark Lay to reverse the transactions. Fensterstock flew to Pittsburgh to "personally observe him [Lay] affecting the reverse in transactions." [Fensterstock Tr. Docket No. 143, p. 385]. While in Pittsburgh, Lay "suggested that he transact with the investment advisor funds in order to make sufficient monies to ultimately satisfy the short fall." [Fensterstock Tr.

---

**8.** The defendant's supplemental sentencing memorandum (Docket No. 174) at pages 28 and 29 criticizes the government's reliance on the issue of recidivism. The defendant testified at the July 3, 2008 sentencing hearing and minimized his conduct with Mellon Bank and PNC. The Court finds his testimony regarding his employment at Mellon Bank and PNC not to be convincing and rejects the defendant's analysis.

Docket No. 143, p. 386]. In other works, Lay wanted to use one client's funds to satisfy his obligation to Bond Direct. Fensterstock refused to allow this, because "It's illegal." [Fensterstock Tr. Docket No. 143, p. 386]. Even after Lay broke the rules at Mellon and received another chance, and broke the rules at PNC and received another chance, and broke the rules at OBWC and received another chance, his thoughts turned to breaking more rules, this time, using one client's money to satisfy another debt.

The Court finds merit in the government's allegation concerning the ·defendant's interaction with Bonds Direct.

### 5. The Government's Allegation of Lies to Credit Suisse

In support of this allegation, the government charges as follows:

When Lay over-leveraged the ADF, Credit Suisse suspected the over-leveraging of the Fund.[9] As a result, Credit Suisse asked Lay if the client knew about the over-leveraging. Lay told Credit Suisse that he had permission to over-leverage, and then went a step beyond, faxing a falsified document purporting to authorize his over-leveraging.[10] Lay's lies and fabricated doc-

uments did not persuade Credit Suisse to maintain the prime brokerage relationship.

The Court finds merit in the government's allegation concerning the defendant's interaction with Bonds Direct.

### 6. The Government's Allegations of Familial Infidelity on the Part of the Defendant [11]

In and in addition to the government's claim that the defendant is a recidivist, it alleges, in support of its opposition to a downward variance, examples of misconduct on the part of the defendant. A description of the examples follows.

First, the government contends, contrary to paragraph 63 of the presentence report, that in December of 2006, and before the defendant was charged, Christopher Bennett and Bennett's wife, Kelly Settles, separated because she was having an affair with the defendant. Continuing, the government charges that after Bennett [12] separated from his wife, the defendant moved in with Settles and her three children; that Settles traveled the world with Lay to places such as Africa, U.S. Virgin Islands, Hawaii and Colorado. Continuing, the government charges that the defendant and Settles moved into a $500,000 house that Settles allegedly pur-

---

9. *See* the testimony of Steven McMorran, the credit officer for hedge funds at Credit Suisse who indicated that the leverage agreement between the defendant and OBWC as related to him by Mark Lay, was 150%, but that eventually, he saw leverage at 3,000% (Docket No. 143, page 353).

10. *See* the testimony of Gary Gluck, an employee of Credit Suisse, at Docket No. 128, and also government's exhibit 365 and the testimony of Steven Mahoney, an employee of Credit Suisse (Docket No. 128) and government's exhibit 363 of three pages which is also attached hereto as Appendix II. Government's exhibit 363 refers to the failed attempt of the MDL Active Duration Fund to secure

the approval of the OBWC to agree to leveraging in excess of 150%. OBWC refused to agree to such a modification.

11. This section may also be appropriately considered under history and characteristics.

12. Christopher Bennett appeared as a witness for the government, subject to a subpoena, at the sentencing hearing on July 3, 2008. He conceded that he had multiple affairs while married to Kelly Settles. However, he also testified that he had hoped that in some fashion his marriage could have been salvaged but for the exacerbating factor of Mark Lay's relationship with his former wife, Kelly Settles.

chased with her MDL salary of $3,000 per month (*see* SEC transcript page 37). The government also alleges that the $500,000 house was sold in September of 2007, in contrast to the defendant's incomplete account with the Probation Department. The government's challenge to the claim of Lay regarding his family relationships continues with the following revelation:

> Lay and Settles continue to work as a team. In fact, at least on paper, Settles is now Lay's boss. In a sworn statement that Lay gave to the SEC on April 17, 2008, approximately one week *before* the final PSR was published, Lay admitted facts that he did not tell the probation officer. Primarily, Lay is not "unemployed" as the PSR states in paragraph 71. In fact, Lay (1) has been employed as a consultant for a "proposed recycling facility" since approximately February 2008, (2) was paid a $10,000 starting bonus at that time and (3) is currently earning a monthly salary of $3,000 which he expects to earn for "the foreseeable future". *See* SEC Tr., 12–14, attached as Ex. 12. Interestingly, Lay's employer is a Limited Liability Company whose three members include Kelly Settles and Misiadis "J.R." Cabrera, the broker who testified at trial that he earned $3 million on the trades he executed at Lay's direction for the ADF. *See* Testimony of Cabrera, Docket No. 143, pp. 394 and 409.

The government's concern about the Mark Lay–Kelly Settles relationship is a subject of further commentary in the government's supplemental sentencing memorandum filed on June 23, 2008. See pages 3 through 7.[13] In summary, the govern-

ment contends that Mark Lay has been sleeping at the home of Kelly Settles contrary to his assertions with Pretrial Services; that he has provided her with at least $238,900.00 [14] as reflected in exhibit 1 attached to the government's supplemental sentencing memorandum and that the fact of Mark Lay's presence at the home of Kelly Settles was confirmed by an FBI visit to the residence of Kelly Settles on June 10, 2008 when the defendant answered the door.

The defendant's amended supplemental sentencing memorandum filed on June 24, 2008, (Docket No. 174), responds to the Lay–Settles issue with the following declaration:

> Mr. Lay has been forthright in advising the Court that for various reasons he and his long time spouse, Toni, have separated. Mr. Lay continues to provide support to his children and maintains an amicable relationship with is [sic] former spouse. She has attended most if not all court proceedings. The government has presented scurrilous accusations against Mr. Lay that Mr. Lay's actions resulted in the deterioration of the marriage between Chris Bennett and Kelley Settles, an accomplished female business associate of Mr. Lay. These claims are untrue.
>
> Contrary to the claim of the government, Chris Bennett, a minister, informed the undersigned that his marriage to Kelley Settles did not terminate by reason of an affair with Mark Lay. On the contrary, Ms. Settles, who is available to testify in Court, will state that her former husband, a minister,

---

13. During the sentencing hearing conducted on Tuesday, May 27, 2008, counsel for the defendant had indicated to the Court that they intended to call Kelly Settles as a witness. However, Kelly Settles did not testify either on Tuesday, May 27, 2008 or on July 3, 2008.

14. During the defendant's testimony on July 3, 2008, he indicated that Kelly Settles received $200,000 from the defendant after he received a finder's fee of $1 million. The defendant indicated that Kelly Settles had engaged in work that supported his payment to her in the sum of $200,000.

was engaged in numerous instances of extra marital behavior that led to the demise of their relationship. Ms. Settles will testify that she has since established a romantic relationship with Mr. Lay, but that this developed during a period when they were both single.[15] Attached at Exhibit L is a resume of Ms. Settles. This resume establishes that Ms. Settles is a talented graduate of the University of Pennsylvania and [a] person capable of earning a career on her own merit. She has business and personal dealings with Mr. Lay, but she has not secreted funds or otherwise acted to enable Mr. Lay to avoid governmental scrutiny or engaged in any wrongdoing.

The Court notes that there was been a significant period of time since the defendant was convicted on October 30, 2007. There has been a passage of eight months since the defendant's conviction. Against that background, the Court is of the view that the defendant's post-conviction, presentence conduct, is, at best, of marginal importance in the Court's consideration of a downward variance. The Court has engaged in a description of the defendant's post-conduct activity with Kelly Settles for the primary purpose of demonstrating the Court's consideration of such conduct in the context of its announced intention to consider a downward variance. But as indicated, the Court is of the view that such post-conviction conduct is of marginal importance.

7. The Victim Impact Statement Presented by OBWC [16]

The government's sentencing memorandum includes as Exhibit 11 the victim impact statement submitted by the Ohio Bureau of Workers Compensation. It is attached hereto as Appendix III. In the statement, the OBWC asked for the maximum prison term allowable due to the egregious nature of the defendant's actions. Of particular relevance is the statement regarding Investment Manager Terminations and Investment Staff Turnover which state as follows:

a. *Investment Manager Terminations*

The large capital loss incurred from MDL was also a consideration in the decision made by BWC in 2005 to terminate without prejudice all 69 outside active style investment managers who managed most of the investment assets of BWC. Included among these terminated managers were 16 different minority investment management firms who managed an aggregate of over $1.9 billion of BWC invested assets (over 10% of total assets) at the time of transfer of such assets from these minority firms in 2005–2006 to the BWC chosen transition manager. BWC has not yet reinstituted any outside investment manager programs, including those focused on minority managers or Ohio-based managers since this significant termination decision.

*Have you suffered any additional expenses as a direct result of this crime? Such as: increased security, staff turnover, customer loss, workers compensation claims, or perhaps increased insurance premiums?*

b. *Investment Staff Turnover*

The large monetary loss incurred by BWC from the MDL Active Duration

---

15. Contrary to the representation of defendant's counsel, it has developed that Mark Lay remains married to Toni Lay. The divorce is not complete. As earlier indicated, Ms. Settles did not testify.

16. This section may also be appropriately considered under history and characteristics.

Fund was a consideration that resulted in the complete turnover of the BWC Investment Division staff over the 2005–2006 time period. Each of the 12 members of the BWC Investment Division staff as of 3/31/05 were either subsequently terminated by BWC or transferred within BWC. The BWC Investment Division currently consists of nine individuals, with all having tenure of three years or less at BWC. A large amount of time and effort has been devoted by BWC to the careful selection and building of a team of skilled and competent investment professionals with the highest standards of integrity and ethics expected of fiduciaries managing large sums of assets. As a matter of information, total direct departmental expenses of the BWC Investment Division for the fiscal 2006 transitional year were over $1.3 million.

B. 18 U.S.C. § 3553(a)(1)—History and Characteristics of the Defendant

1. Summary of the Defendant's Personal and Employment History

The defendant was born on September 15, 1963, in Pennsylvania to the union of his parents. The defendant has an older brother and a younger sister. The defendant describes his childhood as good. He lived with both parents and siblings. His father was a steelworker who died when the defendant was a senior in high school. His mother worked for the school district.

The defendant married Toni McCoy Lay[17] in Brooklyn, in 1985. The defendant was interviewed by the probation officer preparing the presentence report on January 8, 2008. The interview was conducted by telephone with the defendant's counsel, Richard Kerger, participating. At that time, the defendant indicated that he was separated from his wife, who is suffering from depression. The defendant and his wife have two children, a son, Mark D. Lay, II,[18] age 20, and Marissa Lay,[19] age 29. Both children are enrolled at Howard University.

The defendant is 6′ 3″ tall and weighs approximately 212 pounds. He reports that he is in good health, but has recently been diagnosed with high blood pressure.

The defendant has an outstanding educational background. He reports being an Honor Roll student, class president, captain of the high school basketball team and a member of the National Honor Society. He then attended Columbia University on a basketball scholarship and reports that he was the captain of his college basketball team in both his junior and senior year. He also reports he was the Student Representative to the Board of Directors for Athletic Students. He graduated from Columbia University in 1985 with a Bachelor Degree. The defendant reports that he began working on Wall Street during his sophomore year in college where he traded in foreign currency, thus starting his experience in the stock market.

The defendant reports having the following certifications: Series 7 Brokerage License, Series 63 Blue Sky License and a

17. *See* Appendix IV attached hereto which is the one-page unsigned letter submitted by the defendant's wife Toni L. Lay. The Court notes that the presentence report identifies the defendant's wife as Toni McCoy Lay. No reason is advanced for why the statement is unsigned. The defendant's wife represents that she is a registered nurse. The letter is contained in Docket No. 160–4 and at page 3 of 40 pages.

18. *See* Appendix V attached hereto which purports to be a letter from Mark Douglas Lay, II, but is unsigned. *See* Docket No. 160–4 and at page 5 of 40 pages.

19. *See* Appendix VI attached hereto which purports to be a letter from Marissa Lay, but is unsigned. *See* Docket No. 160–4 at page 4 of 40 pages.

Series 3 Commodities, Futures & Options License.

The defendant has an extensive investment history. He worked for Mellon Bank and CitiCorp Investment Bank in the early 1980s as an FX trader. From 1988 to 1989, he worked for PNC Bank as an FX trader.[20]

From 1989 to 1992, the defendant was employed with Dean Witter Reynolds as a stockbroker earning $45,000 annually. The defendant founded his own company in December of 1992. The company was called MDL Capital Management Inc. According to the defendant, the company started with no overhead and two employees and grew to employ over 40 employees. The defendant claims that MDL grew to be the largest African–American bond management company in the United States.[21] MDL continued in operation until November of 2007, when it closed as the result of the defendant's convictions. The defendant reported his salary was approximately $250,000 annually. The defendant claims that his company never lost any clients' investment money during his years of operation.

The defendant denies ever being seen by a psychiatrist, psychologist or counselor for any reason. He denies taking any type of medication related to mental health issues and he denies being the victim of any type of emotional, physical or sexual abuse. The defendant reports experimenting with cocaine on a single occasion in 1988, after he had learned that his mother had just suffered from a stroke. He indicates he never again used any illegal substance. The defendant reports that he is a social drinker and believes that he does not need any drug or alcohol counseling.

The defendant's financial status has been questioned by the government. The defendant's financial condition, as determined by the presentence report, is set forth in paragraphs 75 through 78 of the presentence report with the conclusion that the defendant will not be financially able to pay a fine, the cost of incarceration and/or the cost of supervision.[22] The defendant's supplemental sentencing memorandum includes the financial statement of the defendant as of June 16, 2008 (defendant's Exhibit M, Docket No. 173–14) and is attached hereto as Appendix VIII. The defendant contends that his liabilities, which includes a payment of $5 million to the State of Ohio, exceed his net assets of $2,245,844.00. The Court has chosen not to devote any time to determine the extent of the defendant's wealth or his current ability to pay restitution.[23]

During the evidentiary hearing conducted on May 27, 2008, six witnesses were

---

**20.** The defendant's prior employment with Mellon Bank and PNC Bank is described earlier with respect to the government's claim of recidivism.

**21.** The defendant's supplemental sentencing memorandum filed on June 23, 2008 (Docket No. 173) is accompanied by a series of exhibits. The defendant is featured in Exhibit J entitled "Black Enterprise" and lists top 50 African–Americans on Wall Street. The defendant is listed as one of those featured African–Americans.

**22.** Paragraph 75 through paragraph 79 of the presentence report (attached hereto as Appen-

dix VII) represented in support of the presentence report's conclusion that based on the defendant's unemployment status, current debt, and his substantial obligation likely to be imposed, that it does not appear that the defendant will be financially able to pay a fine, the cost of incarceration and/or the cost of supervision.

**23.** After the defendant was convicted and prior to his sentencing, the SEC deposed the defendant regarding his financial status. The deposition has been submitted by the government in its sentencing memorandum. (See Docket No. 161–15).

called by counsel for the defendant and gave testimony. The six witnesses were Serena Tenant,[24] Chief Ralph Pallante,[25] Dean Barron Henry Harvey,[26] Dr. Melvin Steals,[27] Kevin Davis and Reverend James Lee Cherry, Jr. The latter two witnesses had not presented statements as had the first four witnesses. Kevin Davis had been involved with Velocity Capital Partners and testified favorably on behalf of the defendant. Reverend Cherry testified as the pastor for the defendant and indicated that the defendant had played a significant role in his church.

Former NFL football greats, Franco Harris and Tony Dorsett, members of the famed Pittsburgh Steelers, have each written letters supporting little or no sentence for the defendant.

## C. 18 U.S.C. § 3553(a)(2)—The Need for the Sentence Imposed

### 1. Seriousness of the offense, respect for the law and just punishment for the offense

The defendant's offense level has undergone a substantial increase due to the enormous sums of money that the OBWC lost as the result of the defendant's over-leveraging the monies transferred from the Long Fund to the ADF. It is the Court's view that the defendant, as he had done in the past (i.e. at Mellon Bank and PNC), attempted to recoup the early losses in the ADF by increasing the amount of leveraging in the belief that he could recoup the previous losses.

The defendant's sentencing memorandum addresses the failed strategy of the defendant in connection with his over-leveraging conduct in the following passage:

> Whether the idea for the Hedge Fund was originally that of Mark Lay, Terry Gasper or someone else, the fact is that there was an appropriate concern that with interest rates rising, the underlying value of the $20 billion in bonds held by the Bureau would decline. The only way to counter this possibility was through a hedging transaction in which bonds were sold with the expectation that interest rates would cause the price of the bonds to drop. That this strategy did not work is not the fault of anyone, but it is the behavior of the market that caused the strategy to be ineffective, not misconduct by Mr. Lay.
>
> There was risk, but defendant reasonably relied on the Bureau's comfort with risky investments. For example, he knew there was $50 million in gold coins. Hedge funds are risky ventures as the Confidential Private Placement Memorandum, Defendant's Exhibit H, makes clear. They are only for sophisticated investors. The Memorandum contains innumerable reference to the uncertainty and possibility of loss. The Memo-

24. *See* Appendix IX attached hereto for the two-page signed letter of Serena Tenant. *See* Docket No. 160–4 at pages 9 and 10 of 40 pages. The testimony of Serena Tenant was consistent with her letter.

25. *See* Appendix X attached hereto for the one-page unsigned letter of Chief Ralph Pallante. *See* Docket No. 160–4, at page 11 of 40 pages. The Chief's testimony was consistent with his letter.

26. *See* Appendix XI attached hereto for the two-page signed letter of Dean Harvey who currently serves as the Dean of the Howard University School of Business. The Dean's testimony was consistent with his letter.

27. *See* Appendix XII attached hereto for the one-page unsigned letter of Melvin H. Steals, Ph.D. Dr. Steals reported that he is a retired school principal. His testimony was consistent with his letter. He concluded his letter with the statement that Mark Lay is not only a positive role model, but also someone who is loved and respected by the people of Aliquippa.

randum reflects the fact that leverage could be used and that the amount of that leverage could be changed. And insofar as reports are concerned, the Memorandum states that "(i)nterim and annual reports for the Fund, once listed, will be sent to shareholders within four and six months, respectively of the end of the period to which they relate". The Bureau had to know it would not receive regular reports.

What the defendant did was to have his employees respond as rapidly as they could in an effort to serve the OBWC. Rather than providing the information that was required, MDL provided volumes more and on a far more timely basis than it was required to do. Defendant's Exhibit H, Page 39.[28]

The defendants [sic][29] were further warned about the uncertainties of these matters through having to execute the Prospective Investor Questionnaire, Government Exhibit 9. In short, this was a risky deal and everyone had to know it.

Nor are these risks unique to the Active Duration Fund operated by defendant. The accompanying article from the *Wall Street Journal* dated January 15, 2008 makes clear if hedge fund operators time the market right they can make billions of dollars for their customers. But if they time it wrong, they can have phenomenal losses. Consider this quote from the article, appearing on page 1: "Also key: Mr. Paulson didn't turn bearish too early. Some close students of the housing market did just that, investing for a downturn years ago—only to suffer such painful losses waiting for a collapse that they finally unwound their bearish bets." See Exhibit A.

That is what happened to the ADF. To be sure the amount of the losses were enhanced by leverage, but had he been correct, the amount of the gains would have been more substantial as well. The market simply did not perform as he anticipated it would. No one has disagreed with this strategy, although some claimed not to have known about the extent of the leverage. But again the unique aspect of this case is that Mark Lay was attempting to protect the State, not harm it.

As the Court undertakes a study as to the seriousness of the offense and the need to impose the sentence that promotes respect for the law and provides just punishment for the defendant's conduct, the defendant's sentencing memorandum reviewing the defendant's past history including his past business experience, is relevant. The defendant recites the fact that he opened his business known as MDL Capital in 1994 beginning only with a telephone and receptionist and built the business into a highly successful venture, employing over 40 people. His counsel contends that he "became one of the nations better recognized financial commentators, appearing regularly on MSNBC and on business-related shows. His opinions were reflected frequently in the *Wall Street Journal.* He was selected as the Entrepeneur of the Year in Pittsburgh by the accounting firm of Ernst & Young." Continuing, his counsel recite the fact that the Long Fund (or the Core Fund) made money as did the state of Ohio generally.

---

28. With respect to the issue of reports and accounts, defendant's Exhibit H at page 39 contains the following statement: "Interim and annual reports for the Fund, once listed, will be sent to Shareholders within four and six months, respectively, of the end of the period to which they relate."

29. Counsel for the defendant attempted to defend the defendant's conduct on the basis of negligence on the part of the OBWC. The reference to "defendants" obviously was in reference to the OBWC despite the fact that the only defendant in the case was Mark Lay.

His counsel contend "the fact is that the circumstances of the market developed in a way never before experienced. Looking back in hindsight, as the Court can do, it seems obvious that he should have stopped following the investment strategy he had in place. But at the time, no one had ever seen an instance in which rising bond prices would not lead to a devaluation of existing bonds. But that is precisely what happened in this time frame. It was the first time in economic history of the United States that that occurred, and his strategy failed, and because of the leverage, failed dramatically."

With respect to an appropriate sentence, counsel for the defendant argue that the "heartland" of this prosecution is the first count, which has as a maximum sentence of a term of five years. Continuing, counsel for the defendant declare that Congress determined, for whatever reason, that the maximum appropriate sentence for a violation of 15 U.S.C. § 80b–6 and 80b–17 was a term of 60 months, not the higher sentence which the advisory guideline calculations provide.[30]

It seems apparent that the defendant had not lost any monies for any clients in the management of the MDL investments until the defendant began excessive over-leveraging with the ADF. It appears from his past experiences with Mellon Bank and PNC that it was not the first time that the defendant took great risks in the belief that he could recoup his losses. The Court notes that the defendant, born in 1963, actively pursued a good education and did not demonstrate criminal tendencies. The defendant has no criminal record. The defendant appears to have been a responsible father. It does not appear to the Court that the defendant was motivated to gain more income by his management of the ADF.

Counsel for the government, sensitive to the Court's indication that it was considering a downward variation from the advisory guidelines range of 263 to 327 months, has provided the Court with summaries of other sentences in cases deemed comparable by the government.

Specifically, the government refers to the state sentence imposed upon Tom Noe who was convicted of the theft of approximately $13 million that the OBWC had entrusted to him for an investment in rare coins.

The government also directs the Court's attention to *United States v. Marino*, SDNY, Case Number 1:05CR01036, where the defendant pled guilty to conspiracy, investment advisor fraud, mail fraud and wire fraud. The defendant received a sen-

---

**30.** The government's sentencing memorandum, anticipating the possibility of a downward variance in the context of the fact that count 1 calls for a maximum sentence of five years whereas counts 2, 3 and 4 call for a maximum sentence of 20 years states:

"Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 60 L.Ed.2d 755 (proper to prosecute under any statute, without regard to penalty, unless discriminatory). Additionally, the Supreme "Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Batchelder*, 442 U.S. at 123–124, 99 S.Ct. 2198. *See also United States v. Bournes*, 339 F.3d 396, 399 (6th Cir.2003)(if same conduct is illegal under two statutes, government may prosecute under either); *United States v. McCullough* 348 F.3d 620, 628 (7th Cir.2003) (prosecutor may decide to charge under either felony or misdemeanor provision of statute).... The criminal penalties for § 1341 and § 1343 were purposefully increased from five to twenty years and § 1349 was enacted to provide an independent statute under which conspiracies to commit mail or wire fraud could be prosecuted and penalized appropriately.

tence of 60 months on the securities fraud count and 240 months on the other fraud counts to run concurrently. A second case to which the government makes reference is *United States v. Israel*, SDNY, Case Number 1:05CR01039.[31] Again, the defendant pled guilty to conspiracy, investment advisor fraud and mail fraud and received a similar sentence of 60 months on the investment advisory fraud and 240 months on the remaining counts, apparently to be served concurrently. The third case referenced involves a case in the Northern District of Georgia in a 24–count indictment against a hedge fund manager, Kirk Sean Wright, for violations of mail fraud and security fraud statutes.[32] The defendant has been convicted and while awaiting sentencing committed suicide.[33]

Continuing, the government refers to the affirmance of a sentence of 135 months by the Eighth Circuit in *United States v. Finn*, 206 Fed.Appx. 631 (8th Cir.2006). According to the government, the defendant received over $3.7 million from over 100 investors, many of whom were elderly. The District Court imposed a sentence at the top of the guideline range of 108 to 135 months.

The government's brief also cites other examples of significant sentences imposed in investment advisory fraud schemes as follows:

| Case Name | Sentence | Loss | Charges |
|---|---|---|---|
| United States v. Marquez[34] (S.D.N.Y.) | 51 months | $6,259,650 | Conspiracy to commit investment advisor fraud and mail fraud |
| United States v. Hamilton[35] | 300 months | $14,256,346.72 | Mail Fraud and wire fraud |

31. The offense conduct that appears in the presentence report for Israel begins at paragraph 10 and concludes at paragraph 43, including the victim impact which demonstrates that more than 250 victims sustained losses as a result of the hedge fund scheme and the loss amount was in excess of $450 million. *See* Appendix XIII for a copy of paragraphs 10 through 45 from the presentence report of Israel.

32. The docket entries reflect that Kirk Sean Wright was convicted of numerous counts. The criminal complaint that initiated the prosecution of Wright indicated that Wright had declared that he had current balances in his investor's accounts approaching $60 million when in fact he had $806.83 in one account and $147,816.00 in a separate account.

33. An article in the Cleveland *Plain Dealer* published on June 5, 2008, reports that Kirk Wright committed suicide. A copy of the newspaper article is attached hereto as Appendix XIV.

34. Marquez was also involved in the same hedge fund as Marino and Israel. Marquez also pled guilty to an information. The information described the means and methods of the conspiracy with respect to Marquez.

35. The docket with respect to Hamilton indicates he received 150 months imprisonment following his conviction of counts 1–6, 8–10, 12–23 and 27, and an additional 150 month sentence for counts 7, 9, 11, 24–26 and 28, with the two 150–month sentences to be served consecutively for a total term of 300 months and restitution in the sum of $14,256,346.72. His convictions followed the trial. His convictions have been affirmed by the Seventh Circuit. The Court has received the presentence report with respect to Hamilton. The offense conduct begins at paragraph 1 and concludes at paragraph 360. Paragraph 2 of the offense conduct, which follows, captures the conduct of Hamilton as it states:

> According to the government, the evidence at trial demonstrated that beginning in approximately 1997 and continuing into 2003, MR. HAMILTON, who for a period of time called himself John Halvorson, devised and implemented a ponzi type scheme, whereby he induced people to give him money un-

(E.D.Wisc.)

| | | | |
|---|---|---|---|
| United States v. Namer[36] (W.D.Tenn.) | 240 months | $32,720,000 | Securities fraud, mail fraud, wire fraud, money laundering, conspiracy, tax evasion |
| United States v. Eberhard[37] (S.D.N.Y.) | 160 months | None. | Investment advisor fraud, conspiracy, mail fraud, wire fraud, obstruction of justice |

A recent article in the *Federal Sentencing Reporter*, Volume 20, entitled "Sentencing High–Loss Corporate Insider Frauds after *Booker*" makes the point that there has been a consistent judicial and prosecutorial reluctance to impose the extraordinarily high sentences the guidelines now prescribed in high-loss corporate fraud cases and that such a reluctance is not surprising. The article also discusses the relationship between "loss" and the fact that in an individual case, the extent of the loss may either overstate or understate the seriousness of an offense or the degree of the defendant's criminal culpability. The articles finishes with the following conclusion:

> There is more than a touch of irony in the current state of federal sentencing for high-profile corporate offenders. By pushing unrelentingly for ever-higher sentences for corporate bad guys, Congress and the Justice Department have escalated the Guidelines applicable to these offenders to such absurd heights that no one, not even the Justice Department itself, takes them seriously. In the pre-*Booker* era, this might have produced a mix of a few real, honest-to-goodness life sentences from those judges who felt bound by the expressed will of Congress and the Commission and outright rebellion from other judges who would refuse to perpetrate what they felt to be an intolerable injustice. The advent of *Booker* alters this dynamic. Judges now are at liberty to disregard Guideline ranges that appear pat-

der the false pretense it would be used to purchase rare, collectible coins and currency, but which he actually used to pay earlier investors and to support his and Ms. Roebuck's lavish lifestyle and gambling activities. The scheme began when MR. HAMILTON and Ms. Roebuck were living in Sheboygan, Wisconsin and were operating a small chain of collectible stores, and continued after they moved to Las Vegas, where they incorporated as Capital Collectibles of Nevada, LLC and used an address where they maintained an answering service and mail drop.

36. The docket with respect to David Namer indicates that he was found guilty following a trial on counts 1–90 and 92–94 and received a sentence of 240 months with all counts to run concurrently with each other; total restitution in the sum of $32,720,000.00 was ordered.

37. Eberhard was initially, with his agreement, charged by way of information including five counts. Subsequently, a superseding indictment was filed against the defendant which included 16 counts. Eberhard eventually pled guilty to counts 1, 2–8, 11, 12 and 16. He received a sentence of 160 months. The Court has received a copy of a portion of the presentence investigation report for defendant Eberhard. Paragraph 18 of the presentence report states:

> From at least 1993, through May 2003, EBERHARD and others engaged in a scheme to defraud clients for whom he provided investment advisory and securities brokerage services. As part of the scheme, EBERHARD misappropriated funds entrusted to him by his clients through a variety of means, including "churning" their accounts to generate millions of dollars in commissions and compensation for himself and his firms, and by making millions of dollars' worth of unauthorized and improper withdrawals and transfers from client accounts.

ently unreasonable and to fashion an appropriate non-guidelines sentence. But because the Guidelines are so out of whack for high-loss corporate frauds, judges and parties to such cases must proceed without even useful "advice" from the Commission. Advocates on both sides and the court itself will, in effect, be operating in a pre–1987, Guidelines-free zone, albeit a zone bounded at the bottom by a general sense that Congress and the Commission intend high-level corporate crime to be strongly punished.

When operating in this environment, defense advocates may find the arguments in the preceding discussion useful in holding sentences down. Individual prosecutors seeking to hike sentences for non-cooperating defendants will doubtless stress the harms, economic and otherwise, inflicted by corporate crime and the imperative of responding forcefully to those who commit it. The Department of Justice as an institution ought perhaps to consider whether its interests are best served by maintenance of untenably stringent rules or by a sensible revision of the Guidelines governing corporate crime to produce sentencing ranges that are both appropriately stern and judicially acceptable in a post-*Booker* world.

The Court has turned to an examination of the Commentary addressing U.S.S.G. § 2B1.1(b) in light of the fact that the loss to the OBWC in excess of $200,000,000.00 calls for an additional 28 levels in the calculation of the advisory guidelines. The Court's interest in the Commentary is also triggered by the fact that the loss to the OBWC did not accrue to the benefit of the defendant.[38]

First, the Court finds that under the provisions of Commentary # 3(A)(i) and (ii) the OBWC suffered an actual loss.

Next, the Court finds the discussion in Commentary # 19 relevant as it relates to the Court's consideration of a downward variance.

Selected portions of Commentary 19 follow:

19. *Departure Considerations.*—

 (A) *Upward Departure Considerations.*—There may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted. The following is a non-exhaustive list of factors that the court may consider in determining whether an upward departure is warranted:

 \* \* \*

 (C) *Downward Departure Consideration.*—There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.

 \* \* \*

Because federal fraud statutes often are broadly written, a single pattern of offense conduct usually can be prosecuted under several code sections, as a result of which the offense of conviction may be somewhat arbitrary. Furthermore, most fraud statutes cover a broad range of conduct with extreme variation in severity. The specific offense charac-

---

**38.** The 2007 Edition of the *Guidelines Manual* was used by the Probation Department in the preparation of the presentence report and the calculation of the total offense level.

teristics and cross references contained in this guideline are designed with these considerations in mind.

The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

The Court is instructed to determine an appropriate sentence in the context of 18 U.S.C. § 3553(a) so as to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the crimes of the defendant. In so doing, the Court has considered the following factors, information and the Commentary addressing U.S.S.G. § 2B1.1(b).

a. The advisory guideline range of 262 months to 327 months.

b. The defendant's earlier experiences with the Mellon Bank and PNC involving significant losses for his employers by his conduct which violated the investment rules of his employers.

c. The defendant's explanation for his conduct with Mellon Bank, PNC, and OBWC has in common the act of finding fault with others for his own conduct.

d. The loss to the Ohio Bureau of Worker's Compensation with an indirect damage to Ohio workers and their employers.

e. The fact that if the defendant had been forthcoming about his practice of over-leveraging beyond 150% when initially questioned about his losses by officials of the OBWC, the OBWC may well have acted promptly to cut its losses at a time when the losses were far less than the eventual loss.

f. The defendant's interactions with Bonds Direct and Credit Suisse.

g. The absence of a criminal record for the defendant.

h. The high esteem with which the defendant is held in his community.

i. The defendant's exemplary conduct with his children.

j. The fact that the primary crime for which the defendant stands convicted is limited to a sentence of 60 months.

k. The fact that the defendant's convictions have apparently crippled his opportunity to remain as an active participant in the investment business.

l. The fact that the defendant is now 45 years old.

m. The fact that the defendant, as a member of the minority community, was able to obtain a college degree from an outstanding college.

n. The defendant's considerable business accomplishments, as indicated in Exhibits I and J attached to the defendant's supplemental sentencing memorandum. (Docket No. 173)

o. The fact that the defendant did not convert to his own use the monies of OBWC other than his fees. There is no evidence before the Court that the defendant derived any income or profited in any manner from his conduct in over-leveraging that led to the massive loss incurred by the OBWC.

p. The scope of the loss to the Ohio Bureau of Workers Compensation.

q. The sentences imposed on other defendants involved in hedge fund

criminal activity. The Court is of the view that comparing other sentences for hedge fund convictions to this case is similar to comparing apples and oranges.

r. The victim's statement of the Ohio Bureau of Workers Compensation calling for the highest sentence possible.

s. The fact that the Court simply is unable to account for or understand the defendant's present financial status after studying the pre-sentence report and studying the recent deposition of the defendant by attorneys for the SEC.

t. The sentence of 64 months imposed on T.W. Gasper, the Chief Financial Officer to the OBWC, pursuant to his plea of guilty to the violation of 18:1962(c), Racketeer Influenced and Corrupt Organizations Act (RICO).[39]

u. The fact that the maximum sentence for counts 2, 3 and 4, as to each count, is limited to 20 years, even though the minimum number of months under the advisory guideline calculation is 262 months, which is 22 months in excess of the statutory maximum.[40]

v. Article in the *Federal Sentencing Reporter*, Volume 20, entitled "Sentencing High–Loss Insider Frauds After *Booker*."

w. The Commentary addressing U.S.S.G. § 2B1.1(b)

Continuing with the analysis in the context of a possible downward variance, the Court notes that if the specific offense characteristic pursuant to § 2B1.1(b) was to be calculated on the fees paid to the defendant and his organization in connection with the operation of the hedge fund; *i.e.*, more than $1,000,000, the offense level for that specific characteristic would be 16 rather than 28.

After considering the totality of the enumerated factors and information, as well as the Commentary addressing U.S.S.G. § 2B1.1(b), the Court will vary downward six levels in the calculation of the total offense level by taking the halfway point between 28 and 16 for the specific offense characteristic based on loss, so that the resulting total offense level is 33.

Consequently, the total offense level of 33 and a Criminal History of I, provides for a sentencing range of 135 to 168 months. The Court permitted counsel to argue as to how the Court should exercise its sentencing discretion and granted the defendant the right of allocution.

After listening to counsel and the defendant, the Court pronounced a total sentence of 144 months as a result of the Court's downward variation and declares that the total sentence of 144 months remains a lengthy sentence and reflects the seriousness of the defendant's offenses, promotes respect for the law and provides just punishment for the offenses.

2. Adequate deterrence to criminal conduct

The use of hedge funds in the investment world is a relatively new development. No previous prosecution with the factual scenario similar to this case has been brought to the attention of the Court. The Court is of the view that its sentence of 144 months, a period of 12 years, affords adequate deterrence to the type of crimi-

---

**39.** Counsel for the defendant argue that the sentence of the defendant should not exceed the sentence imposed on Terrence W. Gasper. The Court disagrees.

**40.** The Court acknowledges that it could sentence the defendant to the minimum calculation of 262 months by making the sentences, in some fashion, consecutive one to the other.

nal conduct exemplified by this prosecution.

### 3. Protect the public from further crimes of the defendant

It appears to the Court that the defendant is a gambler at heart with other people's monies. However, the incarceration in this case is the first time that the defendant will suffer a total change in his life experience. He will be deprived of his freedom, unable to participate in the life of his wife and their children. The Court is of the view that the sentence of 144 months does afford adequate deterrence to the possibility of additional criminal conduct by the defendant and that the defendant's sentence of 144 months will protect the public from further crimes of the defendant.

### 4. Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

The defendant is not in need of educational or vocational training, medical care or other correctional treatment in the most effective manner. To the contrary, the Court is of the view that the defendant possesses sufficient skills to teach other inmates in whatever subjects the prison authorities would deem appropriate.

### III. Conclusion

For the reasons set forth herein, a sentence of 144 months with supervised release for three years, plus an order of restitution and a forfeiture order constitutes a sentence sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2).

IT IS SO ORDERED.

## Appendix I

### The Investor

The Ohio Bureau of Workers' Compensation (hereinafter "OBWC") is an Ohio agency, organized and existing under the laws of the State of Ohio. Beginning in or about 1955, the OBWC began assisting Ohio-based employers and employees to cover expenses related to workplace injuries by providing medical and compensation benefits for work-related injuries, diseases and deaths. Although its main office is located in Columbus, Ohio, the OBWC has 16 customer service offices located across the state of Ohio, including in the Northern District of Ohio. At all times relevant to the offenses charged in the Indictment, the OBWC had assets which averaged approximately 19 billion dollars and was one of the largest exclusive state-fund workers' compensation bureaus in the United States. The assets of the OBWC were under the management and control of the Chief Financial Officer and the employees of the Investment Department. The overall operation of the OBWC involved and affected interstate commerce as did the management and execution of matters regarding its financial investments.

### The Defendant MARK D. LAY

MARK D. LAY (hereinafter "LAY"), during all relevant times, was Chairman, Co-CEO, principal shareholder and Chief Investment Strategist of MDL Capital Management, Inc. (hereinafter "MDL"). LAY founded MDL in 1992 and incorporated it under the laws of the State of Pennsylvania. MDL was, at all relevant times, registered with the Securities and Exchange Commission (hereinafter "SEC") as an investment adviser under the Investment Advisers Act of 1940 ("the Act"). As an investment adviser, MDL provided investment adviser services, including but not limited to the purchase and selling of securities, to corporate, institutional and indi-

vidual investors for compensation. The Act is codified in Title 15 of the United Stats Code.

Title 15, United States Code Section 80b–2(11) defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."

### LAY' Fiduciary Duty as an Investment Adviser to the OBWC

SEC-registered investment advisers and their officers and directors have fiduciary obligations of good faith, loyalty, and fair dealing to the clients who entrust their money to the investment advisers. As a registered investment adviser and fiduciary, MDL and its respective officers and employees, including LAY, were required at all times: (a) to act in good faith and in the best interests of its client, the OBWC; (b) to make full and fair disclosure of all material facts bearing on the investment adviser relationship between MDL and its client, the OBWC; and (c) to employ reasonable care to avoid misleading its client, the OBWC.

### Initial Relationship Between MDL Capital and OBWC and The Long Fund

On or about May 14, 1998, the OBWC and MDL entered into an Investment Management Agreement ("Management Agreement"), signed by LAY on behalf of the MDL and by the then Administrator of the OBWC, whereby OBWC hired MDL as a fixed income investment manager. The Management Agreement established MDL as an "investment adviser" as defined by the Investment Advisers Act of 1940. The Management Agreement required MDL to "use its best professional judgment to manage and invest" the OBWC's money and required MDL to "agree[ ] to adhere to the standard of care and conduct required of a fiduciary under [Ohio Revised Code] Chapter 4123 and any applicable federal and state law."

At all relevant times, Ohio Revised Code Section 4123.44 stated that "fiduciaries shall discharge their duties with respect to the funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and by diversifying the investments of the assets of the funds so as to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so."

Schedule A to the Management Agreement specifies that "[t]he Investment Manager accepts full fiduciary responsibility for the Bureau's assets under its management under the Ohio Revised Code and any applicable federal and state law." Pursuant to the relationship established by the Management Agreement, from on or about May 1998 until in or about July 2003, the OBWC allocated a total of $355 million to the management of MDL to be managed in a fund, hereinafter called the Long Fund. The 1998 Management Agreement required that OBWC pay MDL a quarterly management fee. From on or about 1998 through on or about April 28, 2005, the OBWC paid MDL approximately $1,973.797 in management fees for the Long Fund.

### The MDL Active Duration Fund, Ltd. ("ADF")

On May 2, 2002, the MDL Active Duration Fund, Ltd. (hereinafter "ADF") was incor-

porated by LAY in Bermuda as an investment vehicle through which United States tax exempt investors and non-United States resident investors could invest in a portfolio consisting primarily of government, corporate and mortgage-backed fixed income securities. MDL exercised general management and investment authority over the ADF.

On July 2, 2002, Bye–Laws [sic] governing the ADF were established. The Bye–Laws [sic] gave the ADF Board general management and investment authority over the ADF and provided that the ADF would be governed by a Board of Directors. LAY, along with MDL's President and others known to the Grand Jury, were appointed members of the ADF Board of Directors. Bermuda-based company was named as the Administrator of the ADF. On November 18, 2002, MDL entered into an investment Advisory Agreement (hereinafter Advisory Agreement), whereby MDL was selected to be ADF's Investment Adviser. Pursuant to the Advisory Agreement, the ADF delegated general authority to MDL to manage the investment of the assets allocated to the ADF and to administer the ADF's business and administrative operations, subject to the direction of the ADF's Board of Directors.

The Advisory Agreement referred to the ADF's Confidential Private Placement Memorandum (hereinafter "PPM"), as more fully describing the investment vehicle. The PPM provided, among other things, that, as the ADF's Investment Adviser, LAY and others specified in the PPM would "have direct and primary responsibility for all investment decisions of the fund." The PPM also provided employment credentials for LAY that stated "from 1984 to 1989, Mr. Lay was with Citicorp Investment Bank" and, thereby, falsely extended LAY's time of employ-

ment with the Citicorp and omitted LAY's employment with Mellon which occurred from approximately June 1988 to approximately August 1988 and Pittsburgh National Bank ("PNC") which occurred from approximately September 1988 to approximately August 1989, in an effort to conceal LAY's past employment with Mellon and PNC and the reasons for his separation from Mellon and PNC from the OBWC and others to whom LAY marketed the ADF.

Among other things, the PPM required that investor clients pay MDL both a Management Fee and an Incentive Fee. During the short life of the ADF, the sole investor client, OBWC, paid MDL approximately $1,793,231 in such fees. The $1,793,231 is in addition to the management fee paid for the MDL's management of the Long Fund referenced in paragraph 14 above, for a total of approximately $3,767,028. LAY and the then principal (known to the Grand Jury) of a brokerage firm located in Westlake, Ohio (hereinafter Marketer 1), each solicited the OBWC to invest in the ADF. LAY and Marketer 1 provided the OBWC with a PPM one of which bore the notation: "Copy No. 2 Issued to Great Lakes Capital Partners" and the statement "THE DATE OF THIS MEMORANDUM IS JANUARY 15, 2003", which outlined the terms and conditions of the ADF. The PPM provided that "up to 150% of the Fund's assets, at the time of investment, may be leveraged (i.e., the combined value of borrowings and short positions)." This limitation on the utilization of leverage applied to all ADF assets, including but not limited to United States Treasury Securities. The PPM cautioned that while leverage may "enhance returns", it may also "substantially increase the risk of loss."

On August 20, 2003, OBWC agreed to invest $100 million in the ADF. On Sep-

tember 12, 2003, the OBWC transferred $100 million via electronic funds transfer from the Long Fund to the ADF as the initial investment. Despite efforts by LAY and others to market the ADF to other potential investors, the OBWC was, during all relevant times, the sole investor in the ADF.

### LAY Directed Transactions for the ADF

During all relevant times, LAY directed the trade activity regarding the United States Treasury Securities in the ADF portfolio. During all relevant times, LAY utilized leverage well in excess of 150% of the ADF's assets in contravention of the terms of the January 15, 2003 PPM and in contravention of his fiduciary role as an investment adviser to act in the best interest of his client, the OBWC. In directing and conducting transactions on behalf of the ADF, LAY relied upon the services of several brokerage businesses located in the Northern District of Ohio and elsewhere.

In the Northern District of Ohio, LAY used the brokerage services of the Westlake firm controlled by Marketer 1, which benefitted financially from ADF transactions. Outside of Ohio, in the state of New York, LAY relied on several different entities to act as the prime broker and to execute trade activity. LAY, others at MDL acting at the direction of LAY, and those at the various brokerage firms relied upon by LAY to trade securities for the ADF communicated via telephone, email and mail services, including the U.S. Mail and commercial carrier service.

LAY, others at MDL and other sources provided the OBWC with monthly and other intermittent reports on the ADF. None of these reports showed the amount of leverage exercised in the ADF. After becoming concerned about a $7 million decline in the value of the ADF, the chief investment officer ("CIO") of the OBWC met LAY in or about mid-April 2004 to discuss the loss. During that meeting, LAY did not state or admit that he had exercised leverage of approximately 900%, well in excess of the 150% limitation.

In mid-May 2004, the CIO of OBWC received the April 2004 month-end report on the ADF and learned for the first time that the ADF had lost $32 million, something that LAY concealed during the mid-April meeting with the CIO. At no time did LAY reveal to OBWC that the losses were magnified or caused by over-leveraging, even though LAY then well knew that he routinely had exceeded the 150% limit in the PPM. In or about late Spring 2004, the ADF began suffering significant losses because LAY exercised leverage above the 150% limit set in the PPM. During this time, LAY continued to conceal and misrepresent to OBWC the true nature of the leverage.

Despite the great loss of ADF's value and due to LAY's failure to disclose his use of leverage in excess of 150%, on May 21, 2004, the OBWC invested an additional $100 million in the ADF. This second $100 million investment was also transferred from the Long Fund to the ADF. On or about May 18, 2004, after confronting LAY about the excessive leveraging being utilized in the ADF, the ADF Board of Directors decided to (a) revise the language of the PPM to allow leverage in excess of 150% regarding United States Treasury securities only; (b) to notify the OBWC that LAY had exercised leverage in excess of 150% in the ADF; and (c) to seek the OBWC's approval of LAY's continued exercise of leverage in excess of 150%.

On August 11, 2004, the ADF Board issued a letter to the OBWC entitled "Recent Changes to MDL Active Duration Fund, Ltd." (hereinafter Proposed Revisions Letter), purporting to notify the OBWC of

LAY's past and intended use of leverage in excess of 150%. The Board of Directors requested that a representative of the OBWC sign the letter in acknowledgment of its receipt and in agreement with the change in the use of leverage. The OBWC refused to permit LAY to exercise leverage in excess of 150% and, therefore, refused to execute the letter or agree to the changes to the PPM.

On or about September 16, 2004, the Chief Financial Officer ("CFO") and the CIO of the OBWC confronted LAY about the poor performance of the ADF, which by this time had a value of approximately $57 million dollars, despite the $200 million invested. During that meeting, LAY admitted having over-leveraged the ADF, but even then falsely told OBWC that MDL had only leveraged approximately 900% of the ADF assets, when he then knew and should have known that leveraging exceeded 4500%. By the time the OBWC discovered that the losses and decline in value of the ADF were largely due to LAY's exercise of leverage in violation of the PPM, the OBWC's investment of $200 million had been substantially lost.

On or about September 23, 2004, in order to avoid the imminent loss of all of its remaining investment in the ADF, at LAY's request, the OBWC invested an additional $25 million into the ADF, making the total invested in the ADF $225 million. On September 29, 2004, the OBWC formally requested a redemption of its investment in the ADF by submitting a redemption notice to the ADF's administrator and requesting that the remaining balance of the OBWC's investment be liquidated and distributed to the OBWC by the end of 2004.

In October 2004, LAY contacted the OBWC by telephone and in person in Columbus, Ohio in an attempt to obtain further investments to enable the ADF to cover its margin calls due to LAY's excessive leveraging. The OBWC declined to invest further assets into the ADF. As a result of LAY engaging in fraud and deceit upon the OBWC by using leverage well in excess of 150% and not informing the OBWC or gaining its consent to the over-leveraging, the ADF and, ultimately, the OBWC suffered a large financial loss. As of November 3, 2004, the OBWC was able to recover only approximately $9 million of its $225 million investment.

## COUNT 1

### *(Investment Adviser Fraud: 15 U.S.C. §§ 80b–6 & 80b–17 )*

As investment advisers registered with the SEC under the Investment Advisers Act of 1940, MDL its officers and employees, including LAY, owed fiduciary obligations of good faith, loyalty, and fair dealing to its client, the OBWC, which entrusted the OBWC's money to MDL's management. As a fiduciary, MDL and its respective officers and employees were required at all times to: (a) act in good faith and in the best interests of its client, the OBWC; (b) make full and fair disclosure of all material facts bearing on the investment advisory relationship between MDL and its respective client, the OBWC; and (c) employ reasonable care to avoid misleading its client, the OBWC.

In or about September 2003 through January 2005, in the Northern and Southern Districts of Ohio and elsewhere, the defendant MARK D. LAY, together with others known and unknown to the Grand Jury, including brokers and brokerages located in the Northern District of Ohio and elsewhere, unlawfully, willfully and knowingly did use and cause to be used the mails, wires and other means and instrumentalities of interstate and foreign commerce, directly and indirectly, to: (a) employ devices, schemes, and artifices to defraud,

the client, the OBWC and thereby the ADF; (b) engage in transactions, practices and courses of business which operated as a fraud and deceit upon, the client, the OBWC and thereby the ADF; and (c) engage in any act, practice and course of business which was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in the ADF, in violation of the PPM, and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%.

## COUNT 2

### (Conspiracy to Commit or Attempt Mail and Wire Fraud. 18 U.S.C. §§ 1341 & 1343: 18 U.S.C. § 1349)

From in or about September 2003 and continuing through in or about January 2005, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio and elsewhere, the defendant MARK D. LAY did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury to commit offenses against the United States, namely:

a. to commit mail fraud, in violation of Title 18, United States Code, Section, 1341; and

b. to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Conspiracy Scheme

From in or about September 2003 and continuing through in or about January 2005, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio and elsewhere, MARK D. LAY defendant herein, and others known and unknown to the Grand Jury, including other employees of MDL, other directors of the ADF and brokers assisting in or benefiting from trade activity regarding United

States Treasury Securities in the ADF, having combined, conspired, confederated and agreed with each other and with others known and unknown to the Grand Jury to devise and intend to devise a scheme and artifice to defraud the OBWC as to a material matter and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, (1) caused matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service, (2) caused matters to be delivered by commercial interstate carrier according to the direction thereon, and (3) caused writings, signals and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth in paragraphs 4–7 below.

### Object of the Conspiracy Scheme

It was a purpose and object of the scheme that MARK D. LAY and other employees of MDL, other directors of the ADF and brokers assisting in or benefitting from trade activity regarding United States Treasury Securities in the ADF would defraud, deceive, and manipulate the OBWC regarding the ADF, including the amount of leverage exercised, the impact of leverage on the ADF's value and the management team and administration of the ADF.

### Manner and Means

In furtherance of the scheme to defraud, LAY and others known and unknown to the grand jury caused false employment credentials to be included in the PPM. The credentials language on page 14 of the PPM falsely stated that LAY was employed by Citicorp Investment Bank "[f]rom 1984 to 1989" when Lay well knew that his employment at Citicorp ended in June of 1988. The false credentials omit-

ted LAY's employment with Mellon from approximately June 1988 to approximately August 1988 and PNC from approximately September 1988 to approximately August 1989 in an effort to conceal LAY's past employment with Mellon and PNC and the reasons for his separation from Mellon and PNC from the OBWC and others who relied upon the PPM.

In furtherance of the scheme to defraud, LAY and others known and unknown to the grand jury caused documents and information to be delivered and transmitted interstate, including causing documents and information to be delivered into the Northern District of Ohio from outside the State of Ohio and to be sent from the Northern District of Ohio to locations outside the State of Ohio. These documents resulted in the execution of investment transactions that caused the ADF leverage to exceed 150%. In furtherance of the scheme to defraud, LAY and others known and unknown to the Grand Jury concealed the true nature and effect of the use of leverage in excess of 150% by, among other means, failing to disclose the use of excess leverage and its effect on the OBWC investment funds to the OBWC and to others.

In furtherance of the scheme to defraud, LAY and others known and unknown to the Grand Jury made false statements to others regarding the OBWC's alleged knowledge of the excessive leveraging, OBWC's alleged consent to excessive leveraging, and OBWC's alleged commitment to make additional investments in the ADF.

### Mailings and Wire Communications

In furtherance of the conspiracy, and to achieve its object, one or more of the co-conspirators committed and caused to be committed the following overt acts, among others. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing and attempting to cause, in the Northern District of Ohio, Eastern Division, and elsewhere, the following matters and things to be mailed and delivered by commercial interstate carrier as set forth in each overt act below:

| Overt Act No. | Approximate Date of Mailing | Description of Mailing |
|---|---|---|
| 1 | February 27, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on February 27, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 2 | March 3, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on March 3, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 3 | April 15, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on April 15, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey |

| | | to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
|---|---|---|
| 4 | May 11, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with a maturity date of February 15, 2031 sold on May 11, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 5 | May 27, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on May 27, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 6 | July 30, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on July 30, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 7 | August 17, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on August 17, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 8 | August 26, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with a maturity date of February 15, 2031 sold on August 26, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 9 | September 16, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on September 16, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 10 | September 17, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on September 17, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |

1. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing writings, signals and sounds to be transmitted by wire in interstate and foreign commerce as set forth below:

| Overt Act No. | Description of Wiring | Approximate Date of Wiring |
|---|---|---|
| 11 | Email communication from MARK LAY to broker in New York, N.Y. during which LAY directed the New York, N.Y. broker to pay commission to himself and LAY's Westlake, Ohio broker: "1/4 for you and greatlakes". | August 26, 2004 |
| 12 | Facsimile transmission from MARK LAY to prime brokerage firm in New York, N.Y. transmitting a two-page letter dated August 10, 2004 regarding "Recent Changes to MDL Active Duration Fund, Ltd. (The Fund)." | August 27, 2004 |

## COUNTS 3–4

(Mail Fraud: 18 U.S.C. §§ 1341 and 2)

2. From in or about September 2003 until in or about January 2005, the exact dates being unknown to the grand jury, in the Northern District of Ohio and elsewhere, defendant MARK D. LAY, having devised and intended to devise a scheme and artifice to defraud the OBWC as to a material matter, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, (1) caused matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service and (2) caused matters to be delivered by commercial interstate carrier according to the direction thereon, for the purpose of executing and attempting to execute the scheme and artifice as set forth in Counts 3 and 4 below.

### Mailings

3. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing and attempted to cause, in the Northern District of Ohio, Eastern Division, and elsewhere, the following matters and things to be mailed and delivered by commercial interstate carrier as set forth in each Count below:

| COUNT | APPROXIMATE DATE OF MAILING | DESCRIPTION OF MAILING |
|---|---|---|
| 3 | April 15, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on April 15, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in **Secaucus**, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |

| 4 | May 11, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on May 11, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in **Secaucus**, New Jersey to the office of Great Lakes Capital Partners Ltd in Westlake, Ohio. |
|---|---|---|

Appendix II

### MDL CAPITAL MANAGEMENT, INC.
309 Smithfield Street, 5th Floor
Pittsburgh, PA 15222
Phone (412) 281-1995
Fax (412) 434-1655

2 Pages including this cover page

Date: Aug. 27, 2004

To: Steve Mahoney

Fax: 212-743-5924

From: Mark Lay

Subject: Recent Changes letter -- MDL Active Duration Fund

*******************************************************************************
Comments:

*******************************************************************************
If you do not receive all of the above pages, please call (412) 281-1995.
This information is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged and confidential under applicable law. If you receive this information in error, please notify the sender and destroy immediately.
Thank you.

GOVERNMENT
EXHIBIT
363-1
1 07CR339

CONFIDENTIAL
TREATMENT
REQUESTED BY CSFB

1806

# MDL ACTIVE DURATION FUND, LTD.

August 10, 2004

State of Ohio Bureau of Workers' Compensation
30 West Spring St. L-27
Columbus OH 43215
United States

Dear Shareholder,

RE: RECENT CHANGES TO MDL ACTIVE DURATION FUND, LTD. (THE
 "FUND")

We write in respect of certain changes that have recently taken place and which affect
your investment in the Fund. It is our intention to inform you of all of the changes to the
Fund so that you are aware of them and have the opportunity to seek answers to any
question you may have about the changes.

The changes that we are referring to are as follows:

### Change of Directors

Messrs Oskar P. Lewnowski and C. Raymond Morrison have resigned and Hamilton
Fiduciary Services Limited and Warwick Fiduciary Services Limited respectively have
been appointed in their place as directors of the Fund effective as of May 18, 2004.

### Appointment of Resident Representative

Olympia Capital (Bermuda) Limited has been appointed as Resident Representative of
the Fund.

### Clarification of Leveraging Practices

The Fund's use of leverage has been clarified. Historically, the Fund has leveraged up to
150% of its assets (with the exception of US Treasury Securities) to enhance total return.
With respect to of US Treasury Securities leveraging has been and will continue to be
significantly higher than 150%. In general, the Fund's anticipated use of the various
methods of leveraging results in certain additional risks to the Fund which have also been
more clearly outlined.

WILLIAMS HOUSE, 20 REID STREET, HAMILTON HM 11, BERMUDA
TEL.: (441) 292-1018 FAX: (441) 295-2305

CONFIDENTIAL
TREATMENT
REQUESTED BY CSFB

1807

822

### Amendments to the Confidential Private Placement Memorandum

In light of the above, it was necessary to amend the Fund's Confidential Private Placement Memorandum (the "Memorandum"). In addition to the above, the Memorandum has been updated to reflect that the Fund has launched, the initial offering period has ended and the Fund is offering its shares on a continuing and ongoing basis.

We have enclosed a redline version of the Memorandum for your review.

Please acknowledge your receipt of this letter and the enclosed revised Memorandum by signing the enclosed copy of this letter and returning it to the Fund's administrator, Olympia Capital International Inc. by email to chiron@olympiacapital.com or by facsimile to +1 441 292 3358.

We trust that the above information is of assistance to you. If you have any questions or concerns with respect to this information, please do not hesitate to contact the Investment Manager at your convenience.

Sincerely,

**THE BOARD OF DIRECTORS**
MDL Active Duration Fund, Ltd.

CONFIDENTIAL
TREATMENT
REQUESTED BY CSFB

1808

GOVERNMENT
EXHIBIT
363-3

## Appendix III

GOVERNMENT
EXHIBIT
_11-1_
1:07CR339

### VICTIM IMPACT STATEMENT

**RE:** *United States v. Mark D. Lay*
Court Docket No. 1:07CR339
Assistant U.S. Attorney Benita Y. Pearson
VICTIM: Ohio Bureau of Workers' Compensation

*How have your agency, its employees, customers and/or clients been affected by this crime?*

#### Overview

The wrongdoing and well-publicized criminal activity of investment manager Mark Lay has had a deep and lasting impact on the Ohio Bureau of Workers' Compensation (BWC) and its 2,400 dedicated employees. It has also weakened the trust relationship between BWC and the hundreds of thousands employers and injured workers it serves.

Treating injured workers in a time of great vulnerability and providing low-cost workers' compensation insurance for Ohio employers are BWC's primary responsibilities. Because appropriate benefit determinations have lasting implications on the lives of Ohio's injured workers and employers, it is essential that all parties can trust in the integrity of the workers' compensation system.

This trust relationship between BWC and its customers has been severely damaged as a result of the activities of Mark Lay. Injured workers and employers routinely claim that BWC has made claim determinations or set premium rates simply to recoup lost investments. This false perception has undermined BWC's operational integrity, hurt BWC's customers and weakened the foundation of Ohio's workers' compensation system.

BWC employees have also been adversely impacted by these activities. The challenge of serving injured workers and delivering very difficult news has been exacerbated by the erosion of public confidence and trust in the system. Furthermore, many dedicated BWC employees have had to endure the negative publicity and shame that has been heaped on a once proud public agency. This has undoubtedly reduced employee morale.

While today we know that the fund is safe and will provide for the injured workers of Ohio, the investigation of losses cost millions of dollars. Not only was there a monetary loss but there were also losses in other areas. Resources that were dedicated in past years to serving the employers and injured workers were now being used to investigate the very system they served.

The BWC is asking the court to order full restitution, including the losses and expenses incurred as a direct result of this crime. Additionally, the BWC is asking for the maximum prison term allowable due to the egregious nature of Mark Lay's actions.

The information contained below reflects the effects of Mark Lay's crimes on the BWC and BWC clients/customers.

#### Investment Time Line and Losses

A total of $225 million was invested by BWC in the MDL Active Duration Fund as follows:
$100,000,000 on 9/12/03
$100,000,000 on 5/21/04
$25,000,000 on 9/23/04

1

MDL Active Duration Fund (ADF) was an actively managed fixed income fund created exclusively for BWC and managed under the direct supervision by Mark Lay, the Chairman and CEO of MDL Capital Management Inc., a minority owned and operated investment management firm based in Pittsburgh, PA. The strategy of ADF was to take short positions on long maturity U.S. Treasury Bonds. Such strategy achieves gains if UST bonds fall in price and vice-versa. MDL leveraged ADF beyond contractual risk parameters established by BWC. BWC gave MDL notice to completely liquidate ADF on 10/29/04. Liquidation of ADF was completed on 11/03/04 for proceeds of approximately $9 million, resulting in aggregate capital losses of approximately $216 million to BWC.

### Opportunity Cost Analysis

If the respective $225 million had been passively managed and invested in the widely utilized Lehman Aggregate fixed income index from the periods of the respective three funding dates thru 11/03/04 liquidation, the market value of these funds would have grown by $11.7 million to $236.7 million. If such funds were instead invested in 3-month U.S. Treasury bills, BWC would have earned $1.95 million instead of losing $216 million.

### Investment Manager Terminations

The large capital loss incurred from MDL was also a consideration in the decision made by BWC in 2005 to terminate without prejudice all 69 outside active style investment managers who managed most of the investment assets of BWC. Included among these terminated managers were 16 different minority investment management firms who managed an aggregate of over $1.9 billion of BWC invested assets (over 10% of total assets) at the time of transfer of such assets from these minority firms in 2005-2006 to the BWC chosen transition manager. BWC has not yet reinstituted any outside investment manager programs, including those focused on minority managers or Ohio-based managers since this significant termination decision.

*Have you suffered any additional expenses as a direct result of this crime?*
*Such as: increased security, staff turnover, customer loss, workers compensation claims, or perhaps increased insurance premiums?*

### Investment Staff Turnover

The large monetary loss incurred by BWC from the MDL Active Duration Fund was a consideration that resulted in the complete turnover of the BWC Investment Division staff over the 2005-2006 time period. Each of the 12 members of the BWC Investment Division staff as of 3/31/05 were either subsequently terminated by BWC or transferred within BWC. The BWC Investment Division currently consists of nine individuals, with all having tenure of three years or less at BWC. A large amount of time and effort has been devoted by BWC to the careful selection and building of a team of skilled and competent investment professionals with the highest standards of integrity and ethics expected of fiduciaries managing large sums of assets. As a matter of information, total direct departmental expenses of the BWC Investment Division for the fiscal 2006 transitional year were over $1.3 million.

### Investment Consulting Services

The large capital loss incurred from MDL was also a consideration in the decision made by BWC in 2005 to engage the investment consulting services of Ennis Knupp (EK). EK was engaged to assist in analysis of the investment policies and procedures utilized at BWC to evaluate the then-existing division structure and resources, to analyze the valuation and performance of BWC's portfolio, and to provide overall recommendations for improvements. The total cost of these services was $1,564,476.

2

GOVERNMENT
EXHIBIT
11-2
1:07CR339

## Fiscal & Planning Division Impacts

Daily BWC Purchasing/Accounts Payable operations were significantly impacted as a result of the MDL case. Procurement of goods and services for the agency was delayed while procurement and accounting staff tracked, researched, reviewed, photocopied and compiled numerous information requests containing hundreds of thousands of pages of proposal and competitive bid documentation. This activity kept staff from daily duties and tied up equipment unnecessarily. It increased costs due to hours required to provide information and increased copier maintenance, paper, supply and equipment costs. As a matter of information, total direct departmental expenses of the BWC Purchasing Accounts Payable operation for the fiscal 2006 year were over $1 million.

Daily operations of the Financial Reporting staff were significantly impacted as numerous hours were spent responding to information requests from the Management Review Team (MRT), special audits, investigators, attorneys, and the news media. The recommendation from the MRT to terminate contracts with all existing investment managers, to liquidate the investment portfolio, and resulting purchase of units in a bond index fund significantly increased the daily work load for Financial Reporting staff. As a matter of information, total direct departmental expenses of the BWC Financial Reporting operation for the fiscal 2006 year were over $1 million.

Although field work had been completed for the fiscal year 2005 audit, BWC's external auditors would not issue the audit report due to uncertainties resulting from the investigations and criminal cases. The external audit firm was paid approximately $297,000 for this audit work. BWC and the Auditor of State ultimately terminated the contract with the external audit firm because it would not issue the audit report. The audit for fiscal year 2006 was also delayed. The fiscal year 2005 and 2006 audits were completed by a new independent public accounting firm with assistance from the Auditor of State. The combined cost for these audits was almost $590,000. The delays in the fiscal year 2005 and 2006 audits also delayed the issuance of Ohio's statewide audit report.

## Internal Audit Division Impacts

The BWC Internal Audit Department staff devoted a number of hours reviewing and auditing the factors that allowed the MDL situation to happen. Additionally, they made recommendations concerning potential control improvements. The departmental expenses regarding these duties were over $16,935.

## Summary of Specifically Identified Financial Impacts

The investigation and increased costs associated with the MDL case cost BWC almost $2 million. These include the following costs:

Special Counsel Fees (Bailey Cavalieri) - $1,713,830
Special Counsel Fees (Schottenstein Zox & Dunn) - $5,762
Special Audit fees (Clark Schaefer Hackett) - $98,938
Internal Audit fees (BWC) - $16,935

Signature: _Tracy L. Valentine_ Title: _Chief Fiscal & Planning Officer_
Date: _April 5, 2007_

3

GOVERNMENT
EXHIBIT
11-3
1307C039

## VICTIM FINANCIAL STATEMENT

**A. DAMAGES:**

1. List type and amount of loss. (Wherever possible, attach documentation.)

 Fraud $ 216 Million

2. List miscellaneous damages or expenses (type and amount). Include such items as workers compensation claims, transportation costs during investigation, etc.

| | |
|---|---|
| Special Counsel Fees (Bailey Cavalieri) | ........ $ 1,713,830 |
| Special Counsel Fees (Schottenstein Zox Dunn) | .....$ 5,762 |
| Audit fees (Clark Schaffer Hackett) | ........$ 98,938 |
| Internal Audit costs | ........$ 16,935 |

 **TOTAL LOSS** ............................$ 217,835,465

**B. REIMBURSEMENT RECEIVED: (Please attach documentation)**

1. Workers Compensation ...................................................................$ 0

2. Restitution already paid ...... ………………….................. ..............$ 0

3. Insurance (list type and amount)………………………………………..$ 0

 **TOTAL REIMBURSEMENT**................................................. $ 0

I declare under penalty of law that the above information is true and correct.

Signature: *Tracy L. Valentine*

Title: *Chief Fiscal & Planning Officer* Date: *April 5, 2008*

-----------------------------------------------------------------------------------------

If restitution is ordered, where should payments be mailed?

Name: *Tracy L. Valentine* Title: *Chief Fiscal & Planning Officer*

Company: *Ohio Bureau of Workers' Compensation*

Address: *30 West Spring St. L-24*

 *Columbus* *Ohio* *43215*

 City State Zip Code

Phone: *(614) 466-1241* TAX ID#: *31-1334187*

4

GOVERNMENT EXHIBIT
11-4
1:0 'CR039

Appendix IV

May 22, 2008

Dear Honorable David D. Dowd,

My name is Toni L. Lay. I am a Registered Nurse currently working at a Home Health Care Agency. I received a Bachelor's of Science in Nursing from the University of Pittsburgh, Class of 1985.

I am writing to express my sincere desire that you allow Mark Lay to demonstrate to the good people of the state of Ohio that he is an upstanding and trustworthy man. He would not deliberately mislead someone into believing something that was not true or proper. I have known Mark since he was sixteen years old. I am grateful for the opportunity to have had him in my life. We have been married for twenty-three years, and together for five years prior to marriage.

Mark is a true role model to all who know him. He suffered greatly when his father died during his senior year of high school. Others may have let that be a crutch to use as an excuse to fail. Mark used this experience to drive him forward. He went on to college, and became successful in spite of his hardships. He worked tirelessly caring for his family and mine. Mark is very devoted to his faith and instilled in our children the importance of trust and belief, and the difference between right and wrong. As a young adult, I became cynical of "religion". Mark patiently guided me back to the Lord and my salvation by his encouragement and example.

People often tell me what an instrumental role Mark has played in their lives. His true passion is coaching youth basketball. Many highly regarded young men recall how "Coach Mark" helped them when their own fathers were indifferent or incarcerated. Discipline was the key to his ability to win the hearts and respect of otherwise troublesome boys.

Mark is an excellent father to our son and daughter, and a beloved uncle to many who rely on him. He is the finest man that I have ever known or will know. I implore you to be merciful on his behalf.

Sincerely,
Toni L Lay

## Appendix V

TO: The Honorable David D. Dowd

FROM: Mark Douglas Lay II

Your Honor my name is Mark Douglas Lay II the only son of Mark Douglas Lay Sr. I am a full-time marketing major at Howard University in Washington DC, where I have just completed my junior year. I am currently still in the District of Columbia taking summer courses to try to attain a better grade point average, which my father has always stressed to me is key.

My father has from day one been able to instill a great sense of morality in me from a very early age and has always corrected me for my mistakes as well as rewarded me for my achievements, without his teaching as a young African American man I have no idea where I would be today. My father has always led by example and can be considered a beacon for young people throughout not only my community of Aliquippa, which I believe he saved my generation through his teachings at a local church, Triedstone Baptist, and his youth league basketball aimed to teach as well as keep children off the streets, but throughout the world

Following my fathers life would without a doubt give anyone the blueprint to success not only in the world of business, but as a man. I am honored to have grown up under his wing and have tried to emulate his every move in hopes that one day I can be half the man my father is. He has always given me direction in my life when I believed there was no where to go. He has always been there to push me to my limits in order to show how good I can be. Without him as my backbone I would be lost. As I grew up I never wanted to be Michael Jordan or Jerry Rice, Mark Douglas Lay Sr was the only man I wanted to be and I need him to continue to look up to, because my journey as a man is far from over and he is my light and without him I would be lost.

## Appendix VI

Dear Honorable David D. Dowd,

I am writing to express my concern for Mark D. Lay as his sentencing is approaching. My name is Marissa Lay and I am the only daughter of Mark Lay. I am currently a junior Marketing major at Howard University, where I am a member of the School of Business Executive Leadership Honors Program, and I have made the Dean's List every semester that I have been in college; however, my goals do not stop there. I was always taught that when you work hard early in life, good things and blessings will be bestowed upon you in the end. Observing my father from an early age up until now, I can only pray that all his hard work was not in vain.

He has always taught me to be honest, loyal, and determined. These are traits that I have always seen in him, that were irrelevant to be passed on to me. I love my father whole-heartedly and I definitely believe that he is responsible for the individual that I am growing to be. He has always been involved with the community in several ways, whether it was teaching his Sunday School Class at church or coaching his 5th and 6th grade basketball team. Anyone in the city of Aliquippa would express their gratitude for my father and the positive changes that he has made in the lives of many, if they were given the opportunity.

I know in my heart that my father would never commit any crime that would be harmful to anyone. He has a heart of gold and would bend over backwards to help people. He is very intelligent and knows his business; however, mistakes are made when miscommunication is involved. These trials and tribulations going on in this time of his life are not only affecting him, but my entire family as well. My father is our backbone and a necessary factor in our lives. I have known and been with him for almost 20 years now and our father-daughter bond is extremely important to me. I plan on getting married and having children one day and I pray that my father can experience my life's journey beside me. I ask that you have mercy on him and keep my entire family in mind while sentencing him.

Sincerely,
Marissa Lay

## Appendix VII

RE: Mark D. Lay

Foreign Exchange Department, causing the bank to incur a loss of approximately $684,000. According to several memos, the defendant had completed a number of transactions before and after business hours in violation of the company policy and he did not report the activity according to procedure. The defendant confirmed that he tried to trade his way out of the loss.

74. He also worked for Mellon Bank and CitiCorp Investment Bank in the early 1980's as a FX Trader. His salary was approximately $60,000 per year. According to a Mellon Interoffice Memorandum written on July 19, 1988, the defendant had made an unauthorized trade after closing hours and admitted to indicating a fictitious trade on his blotter. The defendant signed a statement indicating that it was a mistake he tried to correct by trading.

### Financial Condition: Ability to Pay

75. The defendant submitted financial paperwork regarding his net worth and monthly cash flow. He reported the following:

**Cash**

| | | |
|---|---|---|
| Cash on Hand | | $0.00 |
| Checking Account(s) | | $0.00 |
| Cash Value of Life Insurance | | $3,000.00 |
| | Subtotal | $3,000.00 |

**Unencumbered Assets**

| | | |
|---|---|---|
| Motor Vehicle(s) - 2004 Ford Thunderbird | | $20,000.00 |
| Jewelry, Furs, Art, Etc. - Gold coins, Art, and Jewelry | | $53,000.00 |
| | Subtotal | $73,000.00 |

**Equity in Other Assets**

| | | |
|---|---|---|
| Real Estate -320 Fort Duquesne, 710 Laughlin, & 2917 Highland Beach, Chatham Towers **However, according to information provided by the government, the defendant has additional properties which may not be included in this figure. | | ($740,000.00) |
| Motor Vehicles - 2004 BMW | | $35,000.00 |
| | Subtotal | ($705,000.00) |
| | Total Assets | ($629,000.00) |

19

RE: Mark D. Lay

**Unsecured Debts**

| | | | |
|---|---|---|---|
| Credit Cards - Line of Credit, and two Visa accounts | | | $487,000.00 |
| Motor Vehicle(s) - 2004 BMW | | | $13,000.00 |
| | | Total Debts | $500,000.00 |

**Net Worth** ($1,129,000.00)

**Monthly Cash Flow**

Income

| | | | |
|---|---|---|---|
| Defendant's Net Salary | | | $0.00 |
| Spouse's Net Salary | | | $2,916.00 |
| Net Rental Income | | | $600.00 |
| | | Total Income | $3,516.00 |

Necessary Living Expenses

| | | | |
|---|---|---|---|
| Rent/Mortgage (for three properties) | | | $10,800.00 |
| Utilities | | | $300.00 |
| Groceries/Household Supplies | | | $100.00 |
| Minimum Installment Payments | | | $3,000.00 |
| Transportation | | | $100.00 |
| Auto Insurance (two vehicles) | | | $85.00 |
| Auto Lease | | | $729.00 |
| | | Total Expenses | $15,114.00 |

**Net Monthly Cash Flow** ($11,598.00)

76. According to an Experian Credit report conducted on January 2, 2008, the defendant has approximately 20 accounts in collection status and owes $163,621 in past due debts. However, a Personal Financial Statement dated September 30, 2006, from Dollar Bank shows that the defendant's income was $266,000 from MDL Capital Management. With the defendant's additional income from rental property and privately owned businesses, his income was $1,011,432.

77. Also according to the records from Dollar Bank, the defendant's personal assets totaled $984,000, not $53,000 as indicated by the defendant. The defendant's total assets were

20

RE: Mark D. Lay

$4,874,000, while his total liabilities were $1,658,912, making his net worth in 2006 approximately $3,215,088.

78. It should be noted that documents from Astorino an interior designing company show that in 2005, the defendant spent approximately $237,558.46 to furnish Gateway Towers, $23,747.34 in 2004, and $39,603.80 in 2007. According to income tax returns submitted for 2001, 2002, 2003, the defendant adjusted gross income was $762,601, $1,006,438, and $1,297,811 respectively.

**Financial Analysis**

79. Based on Mr. Lay's unemployment status, current debt, and the substantial restitution obligation that is likely to be imposed in this case, it does not appear that he will be financially able to pay a fine, the cost of incarceration and/or the cost of supervision.

## Appendix VIII

### FINANCIAL STATEMENT OF
### MARK D. LAY

#### June 16, 2008

**ASSETS**

**Cash in bank:**

| | |
|---|---:|
| Dollar Bank | $47.00 |
| Fidelity Bank | $37.00 |

**Cash on hand:** $600.00

**Real Estate:**

| | |
|---|---:|
| 320 Fort Dusquesne Blvd. Pittsburgh, PA 15222 | $1 200,000.00 |
| 2917 South Ocean Blvd. Highland Beach. FL 33487 | $750 000.00 |
| 710 Laughlin Avenue Aliquippa PA 15001 | $100 000.00 |
| 6H Chatham Towers Pittsburgh PA 15222 | $70 000 00 |
| 15C Chatham Towers Pittsburgh. PA 15222 | $70 000.00 |

**Automobile:**

| | |
|---|---:|
| BMW 645 | $20 000.00 |

**Income:**

| | | |
|---|---|---:|
| RSS, LLC Receivable | $3000 per month | $28 000.00 |
| Rental Income | $600 per month | $7 200.00 |
| | **TOTAL ASSETS:** | **$2,245,884.00** |

**LIABILITES**

**Mortgages:**

| | |
|---|---:|
| 320 Fort Duquesne Blvd. Pittsburgh. PA 15222 | 5498,527.00 |
| 2917 South Ocean Blvd Highland Beach FL 33487 | $519,423.00 |
| 710 Laughlin Ave. Aliquippa. PA 15001 | $77.882 00 |
| Condo Fees Owed | $54 000.00 |

Financial Statement of Mark Lay 6-16-08

DEFENDANT'S EXHIBIT
M

**Bank Debt:**

Dollar Bank Pittsburgh PA $1 400,000.00

**Car Loan:** $9 700.00

**Credit Cards:**

American Express $150 000.00
Mastercard Visa
MDL Lien $250.000 00

**IRS:**

State of Ohio $5 000 000,00

KL & Gates (Paid $396,512) $1,346.235.00
Buchann Ingersall (Paid $98,391) $308.491.00
Patton Boggs (Paid $1 387,335) $375 043.53
Robert J. McKay Ph D (NERA) $450 000 00

 **TOTAL LIABILITES:** **$10,437,061.53**

 **NET WORTH:** **-$8,181,197.53**

Appendix IX

May 22, 2008

To The Honorable David D Dowd Jr.
United States District Judge for the
Northern District of Ohio

Reference: Mark Lay

I am writing this letter today to express my business and personal relationship with Mark Lay. I met Mark in 1996 while serving an elected position of Trustee for the City of Philadelphia Board of Pensions and Retirement. Mark's company, MDL, wanted to manage money for the City's Pension Fund. Mark's presentation was real and down to earth, unlike others that spoke in a language that no one understood. He was willing to explain any questions or concerns that the Trustees had, was clearly knowledgeable, and was obviously willing to work hard for us. As a result, we had no difficulty in selecting Mark's company to manage our funds and, in the following approximately 4-5 years, we were extremely pleased with his management.

In addition, I had the opportunity to see Mark participate on a panel of his peers at a financial conference, and I was again extremely impressed with his ability to communicate and interact with the attendees of the session in which he participated. His overall evaluation by the attendees was outstanding. He actually made bonds seem interesting and understandable.

Page 2

Over the years I have also had the opportunity to know Mark in a personal capacity. I made a choice to leave the City of Philadelphia in 2005 and take a job with EMERALD Advisers, Inc. My company manages money for institutional pension funds, public pension funds, and private individuals. I relied on managers like Mark to help me with learning the business on the "other side". Mark introduced me to some of his peers to help me gain business for my company. His willingness to help others is endless. I found Mark to be the "go to" person when you need someone who is diligent, honest, and can always be trusted to guide you unerringly in the right direction.

Mark is not only a reliable business associate and valued friend he is also a great family man who proudly touts his children's accomplishments. I cannot say enough about Mark's community involvement. While maintaining his home in the "hood", he takes neighborhood children on outings, referees neighborhood basketball games, buys clothing for underprivileged kids, and is an active sponsor of the local Boys and Girls Club chapter.

While Mark pretends to a"tough love" veneer, he is really a teddy bear who is committed to helping others. I am proud to have Mark Lay as my friend.

Sincerely,

Serena W. Tenant

Appendix X

**City of Aliquippa**
**Police Department**
**300 Franklin Avenue**
**Aliquippa, PA 15001**
**724 375-6682**

May 22nd, 2008

**RE: Mark D. Lay**

Dear Honorable David D. Dowd:

I have been with the Aliquippa Police Department for 28 years and the last 8 years serving as the Chief of Police. I am also currently on the City of Aliquippa Police Pension Board. I have interacted with Mark Lay both on a professional and personal basis for approximately 18 years

On a professional level, Mark has shown his honesty, integrity and responsiveness. Mark held regular meetings to inform all involved regarding the status of our pension funds. I found these meetings to be very informative, organized and creative His knowledge and experience with investments kept the pension board well informed of the current market status and his recommendations always depended on the amount of risk the pension board felt comfortable with. He also provided the pension board with quarterly reports on the status of our funds. On one occasion, Mark donated his management fee back to the city. The money was used to purchase much needed equipment for the police and fire departments.

On a personal level, I have always considered Mark a genuine friend. I had the opportunity to interact with Mark and his family on many occasions He has demonstrated his honesty and loyalty to his family and friends. His diligence and personal discipline helped him to achieve his success. On several occasions, I asked Mark to speak with our youth in the City of Aliquippa. He provided much encouragement and leadership in our community. His passion for athletics also provided encouragement for our male youths to strive for success through hard work and discipline.

In writing this letter, I hope to persuade you that Mark is a leader and a role model in the Aliquippa Community.

Sincerely,

Ralph Pallante
Chief of Police

Appendix XI

Honorable Dowd

RE: Personal Letter for Mark Lay

Dear Judge Dowd:

I currently serve as the Dean of the Howard University School of Business I have over 30 years of extensive experience in higher education During my academic career I have held numerous other administrative positions at the University, including MBA Director, Departmental Chairperson, and Interim Dean Additionally, I held other faculty appointments at the University of Nebraska, University of Miami and Georgetown University. I have lectured in various areas of management education including, Organizational Behavior, Management, and Accounting.

Under my leadership, both the graduate and undergraduate programs at the Howard University School of Business have been nationally ranked, the first for a historically black college or university (HBCU). I am also a tenured member of the faculty and have served as a full professor in the Department of Accounting for over 20 years. I have twice been named "Educator of the Year" by the National Association of Black Accountants Inc (NABA). I have held offices and memberships in numerous professional organizations including, the American Institute of Certified Public Accountants, American Assembly Collegiate School of Business, American Accounting Association, Administrators of Accounting Program Group, Accounting Educational Change Commission, National Association of Black Accountants, and D.C. Board of Accountancy. I am also founder of several organizations, including the Washington Consortium School of Business Research Forum and the *African Venture Capital Association.*

I am writing in support of Mark Lay, an individual who I have known for his entire life. Being a native of Aliquippa, PA, I have known the Lay family for more than 50 years. In fact, our families were members of the same church. I consider Mark a personal friend and have watched him grow into an outstanding young man I have also mentored him over the years and witnessed his development from a humble student to the leader of an investment firm. The Lay family has always had strong family values and these values have been passed on to their children Even as a young boy (5 or 6), Mark exhibited great potential; he had an inquisitive mind, demonstrated leadership abilities and compassion for others at this early age. Sadly, he lost his father at an early age, but his mother and the rest of the family persevered to provide a strong and nurturing environment for Mark and his siblings to grow and succeed. Mark did will in school and was an outstanding athlete, but his enduring quality was his humility He has throughout his entire life sought to help others in all that he has accomplished

After graduating from Columbia University, where he was a varsity basketball player and captain, he took a position in New York with an investment firm However, his desire was to return to his small community of Aliquippa, Pennsylvania for which he had developed an

intimate bond. After a few years, Mark and his lovely wife Toni relocated back to Aliquippa and started a family. From then until present, Mark has made significant contributions to the community, not only serving as a role model for the youth, but also sponsoring and participating in many of the area's academic and athletic events. He is also a respected and active member of his family church, "Tried Stone Baptist Church."

Mark's business success is due in large part to his intelligence, personal discipline and his gregariousness He is a very honest and compassionate individual who I am extremely proud to consider a close friend He has my full support and has become a model citizen within his community. Please feel free to contact me if you need additional information. I can be reached by telephone on (202) 806-1508 or e-mail at BHarvey@howard.edu

Sincerely

Barron H. Harvey, Ph.D., CPA
Dean & Frank Ross/KPMG Professor

Appendix XII

May 22, 2008

To the Honorable David D Dowd,

My name is Dr Melvin Howard Steals. I am a retired middle school principal from the Seneca Valley School District, which is located in Butler County PA I was a former English teacher in the Aliquippa School District where I taught for 21 years I returned to that district in June 1996 to become the principal of its middle school I left to take a similar position in Seneca Valley in March 2000

I have known Mark Lay since he was a ninth-grade student at Aliquippa High School He was one of the brightest and finest young men that I have ever taught What I liked best about him, however, was the diligent manner in which he fulfilled his promise to his dying father to become a man of whom his dad would be extremely proud Earning a degree from a prestigious Ivy League school like Columbia is quite an accomplishment.

I was equally impressed by the sterling way in which he represented his family on a daily basis The moral compasses which his parents Charley and Annice Lay took such pains in instilling within Mark and his siblings set the Lay children apart from a large number of their classmates

Whereas many of their peers succumbed to the awesome pressure being exerted by the pernicious social forces that were ruining—and which continue to ruin—young people's prospects for future success, Mark, his older brother Chuck, and their baby sister Amy never wavered nor wandered far from the paths upon which their parents had directed them. Each has since achieved success in his and her chosen field of endeavor.

I discovered the extent to which the parents of my former student Mark Lay had succeeded in raising him during the three-and-a-half years I served as the principal of Aliquippa Middle School (AMS) The fruits of his upbringing manifested themselves in a variety of ways

To begin with, unlike many who had graduated from Aliquippa High School and gone away to college, Mark decided to return to and become actively involved in the rebuilding of his hometown As a result, many, including myself, have benefited from his unstinting efforts to assist those who are committed to making things better there

One way in which he made a contribution was by coaching a basketball team for fifth- and sixth-grade boys. It is significant to note here that Mark became a father figure for those youngsters who came from single-parent homes. In addition to producing a series of championship teams and sponsoring an annual trip to Philadelphia for them to see a 76'er game, he helped his players develop the social skills that were not being fostered in many of their homes.

Another way in which he promoted the expansion of these positive attributes within the local youth was by teaching a well-attended Sunday school class for the teenagers at his church Members of both groups enrolled in the middle school were model students Mark was also very supportive of my efforts to improve the quality of the middle school

First, he entrusted the education of his mentally gifted children to my care. Doing so said volumes about how this influential member of the community felt about what was about to occur in that school Second, he purchased the Algebra I textbooks and teacher's manual which my math consultant had recommended for the middle school's high-end and gifted eighth-grade math students. Their scores on the math section of 1998 state exam helped AMS garner a $10,116 award from the Pennsylvania Department of Education for having generated a significant improvement over previous performances. In closing, Mark Lay is not only a positive role model, but also someone who is deeply loved and respected by the people of Aliquippa

Sincerely,

Melvin H Steals, Ph D

Appendix XIII

Related Case(s)

8. On September 29, 2005, Marino (P47692/K.Minus-Shepard) pled guilty to a four count information (05 Cr. 1036 (CM)) charging him with one count of conspiring to commit mail fraud and investment adviser fraud, in violation of Title 18, United States Code, Section 371; one count of investment adviser fraud, in violation of Title 15, United States Code, §§ 80b-6 and 80b-17; one count of mail fraud, in violation of Title 18, United States Code, Section 1341; and one count of wire fraud, in violation of Title 18, United States Code, Section 1343. On January 29, 2008, he was sentenced to a term of 20 years' imprisonment.

9. On December 14, 2006, Marquez (P50579/J. Y. Kim) pled guilty, pursuant to a plea agreement, to a one count information (06 Cr. 1138 (CM)) charging him with conspiring to commit investment adviser fraud and mail fraud, in violation of Title 18, United States Code, Section 371. On January 22, 2008, Marquez was sentenced principally to a term of 51 months' imprisonment.

The Offense Conduct

10. The investigation of this offense was conducted by the FBI, along with assistance from the U.S. Securities and Exchange Commission.

### The Formation of the Bayou Hedge Fund

11. In1995, ISRAEL formed a hedge fund named Bayou Fund LLC (hereafter the "Bayou Fund" or the "Fund") and was supposed to run the fund with a colleague. After that colleague backed out, ISRAEL asked James G. Marquez to run the fund with him. The Bayou Fund opened in or about 1996, with a little over $1 million and an office in the basement of ISRAEL's newly built home in Harrison, New York. Two other companies were also formed to facilitate the operation of the business. Bayou Securities was created to act as a broker/dealer through which Bayou Fund's trades were executed and commissions on the trades were earned; and, Bayou Management became the "Manager" of the Fund. (Collectively, the three will be referred to as "Bayou"). ISRAEL and Marquez each invested in the Fund and Marquez's wife, who contributed capital to get the business started, held a minority share of Bayou Securities.

12. ISRAEL and Marquez were solely responsible for Bayou's investment strategy and they recruited the investors, who were required to invest $100,000 each. They did this by calling potential investors, sending marketing materials to them, and meeting with them. ISRAEL and Marquez hired Daniel E. Marino, a certified public accountant who had previously done accounting for Marquez's prior hedge fund and was Marquez's personal accountant, to keep the books and reconcile the trading records. In the first year, Grant Thornton, the accounting firm, audited Bayou's books. Although the fund lost money, ISRAEL and Marquez did not disclose this fact to the investors. Instead, upon Marino's suggestion, they gave back a portion of the commissions they earned on trades to the investors and made it appear that they were more successful trading than they actually were.

13. Bayou Fund, LLC, was a hedge fund formed in early 1996 by Marquez and Israel. It filed for domestic limited liability company status on February 15, 1996, in the state of New York. Its principal office was initially located at 31 Buckout Road in Harrison, NY, before relocating to 40 Signal Road in Stamford, CT, in May 1997.

14. Bayou Fund, Limited, was a hedge fund organized under the laws of the Cayman Islands. Its assets and related trading activities were managed by ISRAEL, Marquez, and Bayou Management.

15. Bayou Management, LLC, served as the investment advisor to the Bayou Funds. It filed for domestic limited liability company status on May 9, 1997, in the state of New York. It listed an office address at 40 Signal Road in Stamford, CT.

16. Bayou Securities, Limited, a broker-dealer registered with the SEC and a member of the NASD, acted primarily as a broker for the Bayou Funds. It filed for foreign business company status on January 12, 1996, in the state of Delaware. It listed an office address at 31 Buckout Road in Harrison, NY. Bayou Securities, LLC, filed for domestic limited liability company status on May 9, 1997, in the state of New York. It listed an office address at 40 Signal Road in Stamford, CT. Collectively, these companies are referred to as Bayou Securities.

### Relevant Parties

17. SAMUEL ISRAEL III was a resident of New York. He was a managing member of Bayou Management and acted as a principal, agent, and control person of, and investment advisor to, the Bayou Funds.

18. James G. Marquez was a resident of Connecticut. He was a managing member of Bayou Management and acted as a principal, agent, and control person of, and investment advisor to, the Bayou Funds.

19. Daniel E. Marino was a resident of Connecticut. He was the chief financial officer of Bayou Management, as of late 1998, and thereafter, acted as a principal, agent, and control person of the Bayou Funds.

The Scheme To Defraud

20. In mid-1998, Bayou moved to offices at 40 Signal Road in Stamford, Connecticut. ISRAEL, throughout Bayou's existence, traded from his residences in Westchester County and from the office in Stamford. Marino had his own office across the street from Bayou in Stamford. By the end of 1998, Bayou had accumulated substantial losses and had not earned enough commissions to cover the losses. On or about December 30, 1998, ISRAEL and Marquez met with Marino in a conference room at 40 Signal Road to discuss what they referred to as "the problem." [1]During the meeting, ISRAEL and Marquez told Marino that they wanted him to prepare the Fund's audit, instead of Grant Thornton. During the conversation, Marino apparently indicated that he could not audit the Fund because he was not independent, but ISRAEL told Marino that since Marino did not have an ownership interest in the Fund, and was just the bookkeeper, he could do the audit. Marino told ISRAEL and Marquez that he wanted a videotape saying that he should do the audit and ISRAEL said that he would swear on a video that Marino had nothing to do with the plan, but no video was ever made. Marino asked what would be in it for him and ISRAEL told him to do the audit and they (ISRAEL and Marquez) would cover "the problem." ISRAEL took out a life insurance policy naming Bayou Securities as the beneficiary, in order to pay everybody back in case he died before he had a chance to earn back the money.

---

[1] Defense counsel stated that Marino and Marquez approached Israel with their plan at the end of 1998. Israel, Marino, and Marquez sat down together in an in-person meeting, and Marquez told Israel that Marino could do the"audit," and that if Israel and Marquez "buckled down" and made money, they could recoup the losses. During the meeting, Marquez told Mr. Israel that if the Bayou Fund disclosed its losses, the Fund would fold, Mr. Israel's reputation would be damaged, and Marquez's future in the hedge fund business would be destroyed. Mr. Israel, Marino, and Marquez therefore agreed that Marino would perform the "audit" and disguise the losses.

21. Shortly after that meeting, Marino created a fictitious accounting firm named Richmond-Fairfield Associates ("RFA"), with supposed offices in Manhattan and a telephone. ISRAEL set up a web site for RFA. In furtherance of the scheme, ISRAEL, Marquez and Marino issued statements (a) reporting fictitious positive rates of return in quarterly reports and had those reports mailed to investors; and (b) reporting individual investors' inflated accumulated profits in monthly reports and had those reports mailed to investors. In addition, Marquez, ISRAEL and Marino had annual financial statements mailed to investors that contained, among other misrepresentations: (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) certifications that Bayou had been audited by RFA, a supposed independent accounting firm. Over time, investors made calls to RFA, seeking, among other things, to verify the existence of the accounting firm and to obtain answers about Bayou's financial statements and K-1 tax forms.

22. In the beginning, Marquez and ISRAEL, along with Marino, came up with the fake amount that was supposedly earned. The phony rates of return were decided by Marquez and ISRAEL, taking into account market conditions. ISRAEL and Marquez never made enough in trading to cover the false numbers being reported. In or about 2000, increasingly, ISRAEL and Marquez were arguing about who was to blame for the poor trading record. They had contradictory views about what kind of trading Bayou should be doing. ISRAEL blamed Marquez for Bayou's losses, and came to believe that investors did not trust Marquez with their money and suspected that he could raise more money from investors if Marquez was no longer with Bayou. That belief became concrete when, in around mid to late 2000 or early 2001, a potential investor refused to contribute to the Fund if Marquez was there. Thus, ISRAEL decided Marquez had to leave and Marino convinced ISRAEL to just have Marquez move across the street to 27 Signal Road, where Marino had an office. That way, Marquez could continue trading and go into his own stock research business from there.

23. There were still problems between ISRAEL and Marquez, even with some physical distance between them. Thus, shortly after moving across the street, Marquez sent three handwritten letters to ISRAEL and Marino, in which he discussed his role at Bayou and laid out his view of his future relationship with Bayou and ultimately, the financial terms of his break with Bayou. Marquez believed he should be paid for his interest in Bayou. In a meeting during this time period, at which Marino and Marquez's wife were present, ISRAEL refused to pay Marquez anything, telling him that until "the problem" was solved, Bayou was not worth anything.

24. Ultimately, Bayou set Marquez up in the office across the street, paid some of his expenses, and paid him $12,500 a month in "consulting fees" that mirrored the distributions he took at Bayou. He continued trading, sporadically, on behalf of the Fund but also he and his wife traded for their own clients to earn commissions to pay back the Bayou losses. Marquez's expenses and monthly commissions were netted against the commissions he earned and after that, there was little money left over to pay off the losses. Thus, rather than applying the leftover commissions to repaying the losses, Bayou paid Marquez the remaining commissions.

25. In July 2001, Marquez was retained to raise capital for an energy company then known as KFX and he proposed that Bayou buy stock in KFX on the assumption that when the value of the stock went up, Bayou would earn a great enough profit on the investment to cover Bayou's losses, which, by then, amounted to approximately $6 million. ISRAEL ultimately agreed and Bayou purchased one million shares of KFX, along with 500,000 warrants to purchase additional share of KFX, for approximately $3.6 million. In 2004, three years after Bayou invested in KFX, KFX share prices finally rose and Bayou's shares in KFX were sold, netting Bayou approximately $12 million.

26. After Marquez moved across the street, Marino moved his office into Bayou's space and officially took over as Chief Financial Officer. From then on, he and ISRAEL were the sole principals of Bayou and Bayou grew and grew, as ISRAEL and Marino used the false financial history they had created to persuade potential investors that the funds had a profitable track record. Indeed, they were so successful at deceiving current and potential investors that they obtained contributions of over $500 million. ISRAEL and Marino closed the original Bayou Fund LLC and opened four domestic hedge funds, Bayou Accredited Fund, LLC, Bayou Affiliates Fund, LLC, Bayou No Leverage Fund, LLC, and Bayou Superfund, LLC, as well as two different sets of offshore funds in the Cayman Islands. Investors in all the funds – onshore and offshore – were provided with the same false information. They hired numerous employees, including securities traders, accounting personnel and other administrative staff and by lying to employees and keeping the trading and accounting records separated, and the trading and accounting staffs apart, Marino and ISRAEL prevented employees from ascertaining the true financial status of the funds. Marino continued to manage the accounting portion of the fraud, through RFA, issuing false annual financial statements and fielding questions from investors using false information. ISRAEL was responsible for all the investment/trading activities of Bayou, including the recruitment of investors. In addition to the false written communications sent to investors, ISRAEL had periodic conference calls with investors in which he supposedly updated them about the Funds' trading activities but, in actuality, he

conveyed the false information.

### The Collapse of the Bayou Hedge Funds

27. Throughout the years, apparently as a way to make money (both to make up for losses and to profit ISRAEL and Marino personally), ISRAEL and Marino invested Bayou investor money in numerous venture capital projects, which, in most cases, were legitimate deals but were very risky. The transactions involved movie deals, real estate deals, an international money transferring firm, a software company, a commuter aircraft manufacturer start-up, a clothing designer, and a French cable company, among others. In all, they invested approximately $40 million. Marino was primarily responsible for administering these investments. These investments were not disclosed to investors nor were they investments that Bayou was supposed to be making with Bayou investors' money. Many of them were made through partnerships set up by Marino and ISRAEL known as IM Partners and IMG LLC[2].

28. In the spring and summer of 2004, ISRAEL and Marino attempted to invest over $100 million of Bayou investor funds in secret trading programs which purported to yield exorbitant rates of return – as much as 100% a week. These "prime bank" schemes, which are also referred to as "high yield trading programs," are essentially Ponzi schemes in which the perpetrators claim that a secret trading market exists among the world's top banks or "prime" banks to which the perpetrators have unique access. The top, or, "prime" banks purportedly trade some form of bank security such as bank guarantees, notes, or debentures. These instruments can supposedly be bought at a discount and sold at a premium, yielding greater than market returns with no risk. In reality, no such instruments or markets exist.

29. Perpetrators often claim that only a few "traders" or "master commitment holders" are authorized to trade in these securities, which must be traded in large blocks, typically millions of dollars or more. Promoters represent that they have special access to trading programs and that potential investors, by pooling their funds with that of other investors, can participate in these programs. Promoters often tell potential investors that the programs participate in humanitarian causes and investors may participate in the programs only if they agree to give a share of the profits to the cause.

---

[2] Israel stated that he did not participate in the establishment of IM Partners or IMG LLC, and was not aware of their existence until after his guilty plea

30. ISRAEL was introduced to these fraudulent "prime bank note" frauds by an individual who held himself out as a financial consultant with access to the programs, Robert Booth Nichols. Nichols introduced ISRAEL to numerous other individuals who vouched for the programs' legitimacy and helped to convince ISRAEL to invest in these fraudulent schemes. ISRAEL was told that the programs worked by placing the funds in a "non-depletion" account, which enabled other people to borrow money against the account but prevented anyone from actually taking money out of the account. He was also told that the account would be in ISRAEL's name and that ISRAEL would maintain control over the account.

31. In April 2004, ISRAEL went to London to meet Nichols and, a few days later, ISRAEL had Marino fly to London to meet Nichols as well. In the late Spring and early summer of 2004, Nichols and his wife visited and stayed at ISRAEL's house for months. At around that time, ISRAEL told Marino to transfer $150 million to Barclays Bank in London to a humanitarian group and assured Marino that the money would stay in an account in Bayou's name and that he had documentation for the investment. The humanitarian organization was supposedly supplying countries in Africa with a product that helped AIDS patients. ISRAEL also had Marino execute a Bayou "board resolution" allowing ISRAEL to utilize the money in the Citibank account for an "investment opportunity." Citibank called Bayou to inquire about the transfer and Marino told the bank that the money was going to an investment arm of Bayou. Marino had the $150 million transferred but it was later wired back and ISRAEL told Marino that he would find another program.

32. ISRAEL was then persuaded to go to Deutsche Postbank in Germany, to place the funds in another "program." He traveled to Germany with Nichols and his wife, and met with individuals who held themselves out as officers of Postbank. On or about July 8, 2004, ISRAEL had $120,000,000 transferred from Bayou's Citibank account to an account in ISRAEL's name at Postbank.[3] On or about August 12, 2004, $109,953,000 were transferred from ISRAEL's Postbank account to another account in ISRAEL's name at a second German bank, HypoVereinsbank. But five days later, HypoVereinsbank returned the $109,953,000 to the ISRAEL's Postbank account because the bank was suspicious about the circumstances of the transfer. Thereafter, $109,953,000 were transferred, for a second time, from ISRAEL's

---

[3] While the money was at Postbank, ISRAEL provided $10 million to Nichols which they originally called a consulting fee and then a loan. The "loan" was supposedly collateralized by a box containing $10 million in treasury notes. The box is apparently sealed in lead and is being kept in a safety deposit box in London. ISRAEL never saw the contents of the box.

Postbank account to his HypoVereinsbank account and, again, for the same reason, HypoVereinsbank sent the money back to ISRAEL's Postbank account.

33. After the money was transferred back to ISRAEL's Postbank Account, it was transferred to accounts at Postbank that were in the names of an individual named Walter Golan (a distant cousin of ISRAEL's) and an entity controlled by Golan named the Polaris Group. Polaris Group was supposedly an investment company. Again, the transfers gave rise to bank and law enforcement inquiries and the money was removed from these accounts and transferred to a Postbank internal tracing account, where it was frozen. At that point, ISRAEL retained an attorney in Germany and went to Germany to meet with German law enforcement officials, who suspected that he was laundering money, so he could convince them to release the money.

34. During the time period leading up to this trip and after, ISRAEL was approached by FBI agents who were investigating, along with the German authorities, the transfers of money abroad. On several occasions, ISRAEL answered questions regarding the transfers of Bayou investor money and provided information about Nichols and their dealings, as well as a number of other individuals with whom he had contact in connection with numerous private placement "programs." He also indicated, among other things, that he had done regular trading of stocks and bonds through Postbank and HypoVereinsbank. ISRAEL never indicated that he was participating in a fraud of the Bayou investors by creating a phony accounting firm, and reporting fictitious positive rates of return and inflated net asset values that were supposedly independently verified by that phony accounting firm. ISRAEL also told agents that he would be closing the Bayou Fund because he had been diagnosed with and was being treated for non-Hodgkins Lymphoma.

35. ISRAEL convinced German authorities that he was not laundering money and on October 22, 2004, he was permitted to transfer 90,585,928.54 Euros out of Postbank to an account in his name at Kreis-Und Stadtsparkasse Bank. While the money was at Stadsparkasse, ISRAEL used some of it to pay fees and some of it to purchase bonds. Ultimately, the bonds were redeemed, and the proceeds and interest were transferred, on or about December 6, 2004, to an account in ISRAEL's name at ODL Securities in London. According to Marino, ISRAEL told him that the Postbank contact for the program had tried to steal the money; that he was going to try to broker a program himself; and that the money had been transferred to ODL Securities in London. In around December 2004, ISRAEL had Marino execute another Bayou "board resolution" authorizing ISRAEL to "negotiate and sign investment contracts" regarding $100 million that was on deposit in the account at ODL. According to ODL records, 22,000,000 Euros

were transferred to an ODL securities account at another bank for the purpose of purchasing bonds. But, the bond trade never occurred and ODL returned the money to the ISRAEL ODL ACCOUNT.

36. Thereafter, ISRAEL was introduced to an individual known as Lew Malouf, who supposedly operated another "program" in the United States. ISRAEL told Marino he had to go to San Diego to meet with Malouf and he went out there. In order to participate in Malouf's program, approximately $100 million had to be transferred to a bank account in the United States. ISRAEL had Marino notarize a Bayou board resolution appointing Malouf as director of investments of Bayou. And, on or about April 12, 2005, $99,191,102.18 were transferred from the ISRAEL ODL ACCOUNT to an account at Wachovia Bank, in New Jersey, in the name of "Majestic Capital Management." On or about April 25, 2005, another $810,000 were transferred from Bayou's bank account to the Majestic account.

37. Meanwhile, according to Marino, while ISRAEL was involved with these transactions, no trading was going on at Bayou. Marino was back in Stamford, putting off employees and browbeating them into not asking questions about why ISRAEL (and therefore, Bayou) was not doing any trading. He told them, among other things, that: Bayou was opening a trading operation in Europe; ISRAEL was establishing contacts there and meeting with potential clients; and they should get themselves prepared because a lot of money was going to be coming in. In the last few days before he wrote his Confession Note, Marino finally began telling employees that they might want to start looking for new jobs, in case things did not work out.

38. On May 23, 2005, Marino received a call from Wachovia advising him that the Majestic account was seized by the Arizona Attorney General. Marino recalled that he was at ISRAEL's house when ISRAEL got on the speaker phone with Malouf, who insisted that it was not true, that the money had not been seized, and that the Majestic people had never been in trouble before. In fact, it was true, and ISRAEL then began the process of trying to get the money back.

39. With nearly $100,000,000 of investor money frozen, the fraud on the Bayou investors began to unravel. One of the investors sought to withdraw its investment, despite ISRAEL's and Marino's attempts to deflect the investor's questions and avoid the redemption. On August 12, 2005, Marino could not put off the investor any further and issued a check for approximately $53,000,000. Bayou did not have sufficient funds in its bank account to cover the check and on August 16, 2005, the investor went to Bayou's office in Stamford to meet with Marino and, instead of finding Marino, discovered a suicide/confession note

written by Marino. The investor alerted the local police, Marino was located and federal authorities were notified.

40. SAMUEL ISRAEL and Daniel Marino surrendered to the Court on September 29, 2005, while James Marquez surrendered on December 14, 2006.

### Attributable Loss Amounts

41. According to the Government, ISRAEL is responsible for losses totaling at least $450 million.

### Culpability Levels

42. According to the Government, ISRAEL, Marino, and Marquez are equally culpable for their involvement in the offense.

### Victim Impact

43. There are more than 250 victims who sustained losses as a result of the hedge fund scheme. The intended loss amount was in excess of $450 million. The victims' names and their corresponding loss amounts are forthcoming from the Government.

Appendix XIV

# Suicide ends fund manager's life, but lawsuit lives on

MIKE TIERNEY
New York Times

Wright

ATLANTA — When Kirk Wright was found dead last weekend, suspended from a rope improvised from bedsheets in his jail cell, the book seemed all but complete on a tale of greed and betrayal.

Wright, a hedge fund manager from the Atlanta area, was convicted May 21 of 47 counts of fraud and money laundering for taking more than $150 million in investments from clients that included several former NFL players. He faced up to 710 years in prison and $16 million in fines and could have been ordered to repay clients' losses.

In Cleveland, Wright's involvement in two restaurants in the entertainment district around The Q and what was then called Jacobs Field left a handful of Wright associates on the hook for unpaid bills totaling tens of thousands of dollars.

But the story of Wright, 37, has shifted to another legal battle.

Six former football players, including star defensive backs Steve Atwater and Blaine Bishop, are involved in a 2-year-old civil suit against the Players Association and the NFL.

The lawsuit accuses the union of improperly allowing Wright onto a list of financial advisers provided to members, even though liens had been filed against Wright.

The union, seeking to have the suit dismissed, says that all of its registered financial advisers undergo annual background checks that were developed in conjunction with the Securities and Exchange Commission. The list also includes a disclaimer, indicating that the advisers are neither endorsed nor recommended.

Professional athletes have often lost considerable earnings in risky or fake ventures. Before it began providing a list of financial advisers as part of the collective-bargaining agreement with the league in 2002, a study by the NFLPA found that 78 members had been cheated out of at least $42 million from 1999 to 2002.

## Investment business started with friends

Wright, soft-spoken and charismatic, began small. During testimony at his trial last month, he recalled pooling $2,000 with classmates while pursuing a master's degree at Harvard, then investing modest amounts entrusted to him by relatives and acquaintances while operating a business out of his basement in Virginia. One client was his mother.

Ultimately, in partnership with two socially connected Atlanta anesthesiologists, Wright moved to Marietta, Ga., and attracted hundreds of affluent clients to his firm, International Management Associates. Atwater and Bishop were so impressed that they became recruiters for Wright's firm, which had offices in Marietta. New York and Las Vegas.

Atwater, who declined to comment for this article, and other investors viewed Wright's four sports cars, multiple residences, flashy jewelry and fit-for-royalty $500,000 wedding in the back yard of the main family home as evidence of his investing skills.

Prosecutors say Wright stowed much of his clients' money and made poor investments. They found evidence of fabricated financial statements sent to clients.

Atwater, who earned a degree in business and finance, was among some current and retired players who grew suspicious and tried to withdraw their money. When they sued Wright's firm, the federal authorities shut it down. Wright fled.

## Caught poolside in Miami Beach

For more than two months, he was a fugitive until he was caught poolside at an elegant hotel in Miami Beach, a cocktail at his side, in May 2006. He had been using an alias. The arresting officers found nearly $30,000 in cash, false identifications and a Mercedes in his possession. He had made a down payment on a condominium.

Soon after, Atwater and Bishop, along with Ray Crockett, Al Smith, Carlos Emmons and Clyde Simmons, sued their union and the league and asked for $20 million in restitution. Terrell Davis and Rod Smith said they also lost money with Wright.

The union and the league "are truly responsible for what happened here," Fritz Jekel, a lawyer for the players, said last week. The players association's vetting process was incomplete, he said, adding, 'The whole system is designed to miss things."

The union hires an outside party to carry out background checks, including criminal and credit history, on those who apply to be on the registered financial advisers' list, said Joseph Yablonski, a counsel for the union who is assigned to the Wright case.

The only change in criteria since the program's inception is that advisers must have five years of experience, above the original minimum of three.

## Union challenges merit of lawsuit

Yablonski said the SEC encouraged the union not to be highly selective. The list contains more than 500 names. He quoted the text accompanying the list, which requires a password to access, as saying that the NFLPA "does not endorse or recommend any financial advisers on this list."

He said that only one of the six players had obtained a password and thus would not have seen Wright on the union Web site before investing with International Management Associates.

"This is a case that should never have been brought," Yablonski said. "It has no merit."

The parties agreed that the death of Wright, who was brought into the suit by the union as a third party, should have no legal effect on the matter.

At trial, Wright contended that internal mismanagement was mainly to blame for the soured investments. He also tried to shift some burden to his two associates.

"A basis of the case was that he wasn't the only person responsible," Bill Morrison, Wright's co-counsel, said last week.

The jury deliberated for two days, then convicted Wright on all 47 counts of mail fraud, securities fraud and money laundering. Sentencing was scheduled for Aug. 26.

Wright had been placed on routine security alert after the verdict.